In the Matter of the Probate of the Last Will and Testament of GEORGE S. NICHOLAS, Deceased.

GROSVENOR NICHOLAS, Appellant; GEORGE S. NICHOLAS, JR., and Others, Respondents.

Second Department, April 16, 1926.

Wills — probate — objection to probate on ground that testator was mentally unsound — general competency conceded — objections based on alleged insane delusion that objectant, testator's son, who was disinherited, was disloyal and wished to kill testator — facts show disloyalty on part of son and hence action of testator will not be attributed to insane delusion — no proof that testator's alleged belief, if it existed, that objectant intended to kill him, was reason for disinheriting objectant.

In proceedings to probate a will in which the verdict of a jury to the effect that the testator was of unsound mind was set aside by the surrogate, the action of the surrogate was proper, since it appears that the objectant, a son of the testator, who was disinherited, conceded the general competency of the testator but claimed that the testator was controlled by an insane delusion with respect to the objectant to the effect that the objectant was disloyal, a thief and a liar and was endeavoring to kill the testator, for while the testator evidently had that belief, there was a basis in fact for the hostile feeling he had toward the objectant, since it appears that for many years the objectant had been disloyal to the testator, which was shown by evidence establishing that the objectant who at one time was in business with the testator, had contended that the testator was insane and had various altercations with the testator over the business, refused to co-operate with him and endeavored to ruin his business, and had sued the testator on false claims, and furthermore, that the objectant had surreptitiously procured testator's customers for his own business.

The contention that the testator had an insane delusion that the objectant was trying to kill him is not supported by the evidence, and even if it were, it will not invalidate the will, since it was not shown that the will was the result of such insane delusion and that no other reason existed for disinheriting the objectant.

RICH, J., dissents; KAPPER, J., dissents, with opinion.

APPEAL by Grosvenor Nicholas from a decree of the Surrogate's Court of the county of Suffolk, entered in the office of said Surrogate's Court on the 25th day of February, 1924, which set aside the verdict of the jury, finding that the testator, George S. Nicholas, at the time he executed the instrument offered for probate as his last will and testament, was of unsound mind and incapable of making a will, and admitted said instrument to probate as the last will and testament of the said George S. Nicholas.

*George H. Furman* [*William H. Robbins* and *Joseph S. Frank* with him on the brief], for the appellant.

*Nathan O. Petty* [*Samuel Riker, Jr.*, with him on the brief], for the respondent Farmers Loan and Trust Company.

*William H. Button*, for the respondents George S. Nicholas, Jr., and others.

Young, J. George S. Nicholas, a resident of Suffolk county, N. Y., died on September 13, 1922, aged eighty-two years. He had been successfully engaged in business in New York city for many years and left a large estate. He left a last will and testament, dated October 14, 1921, which provided for four of his children, but disinherited his son Grosvenor in the following language: " I purposely make no provision for my son Grosvenor Nicholas, or his children, because of his unfilial attitude towards me for many years past."

By two former wills, dated June 8, 1916, and July 24, 1917, respectively, the testator had also disinherited this son.

When the document dated October 14, 1921, was presented for probate, his son Grosvenor filed objections to the probate thereof, alleging, among other things, that Mr. Nicholas, at the time of the execution of the instrument, was not and had not been for a long time competent to make a will, but was of unsound mind. After a long trial before a jury, a verdict was rendered that Mr. Nicholas, at the time of the making of such instrument, was not of sound mind and memory and was not capable of making a will. Subsequently the surrogate set aside the finding of the jury and made a decree admitting the instrument in question to probate as the last will and testament of Mr. Nicholas. From this decree the contestant has appealed.

Upon the trial it was conceded that the testator was generally competent, but it was claimed by the contestant that he was controlled by an insane delusion with respect to his son Grosvenor to the effect that he was disloyal, a thief and a liar, and was endeavoring to destroy his business and kill the testator. It would seem, therefore, that the rule enunciated by the Court of Appeals in *Matter of White* (121 N. Y. 406) is applicable to the present case.

It was there held that if it appears that there is any basis in fact for the hostile feeling on the part of the testator toward the person disinherited, the courts will not speculate nor allow the jury to speculate whether that feeling and its results are based upon those facts or upon an insane delusion in regard thereto. The court said: " if there are facts, however insufficient they may in reality be, from which a prejudiced, or a narrow, or a bigoted mind might derive a particular idea, or belief, it cannot be said that the mind is diseased in that respect. The belief may

be illogical, or preposterous, but it is not, therefore, evidence of insanity in the person."

It becomes important, then, to determine whether the record discloses any facts from which it may be said the testator might derive the idea or belief that his son Grosvenor was disloyal to him; that he was a liar and a thief and trying to destroy his business. Even if this belief is illogical or preposterous, if facts are shown to support it in any degree, there can be no basis for the claim of delusional insanity. To my mind, the record clearly discloses such facts.

Grosvenor came into his father's firm in July, 1907. It is conceded that friction between them began as early as 1912. In 1916 Grosvenor claimed that his father was insane, and in July, 1916, his father dissolved the firm and put Grosvenor out. In November, 1921, Grosvenor sued his father, claiming a greater share of the profits than he had received, and also claiming that his father had agreed to retire from the business in 1912, and leave it to him. This suit, of course, was brought a month later than the making of the last will, but there were many altercations on the subject between father and son before this date. In this litigation it has been decided that Grosvenor's claim was false, and this would seem to be convincing evidence of the son's disloyalty. As early as May, 1914, we find the claim of Grosvenor, referred to, in a letter written by his counsel. In July, 1916, Grosvenor advanced the claim that he was entitled to all of the business. Early in 1914 the testator wanted to incorporate his business, but Grosvenor at least failed to co-operate with him to that end. Grosvenor's attorney, in a letter on June 8, 1916, to testator's attorney, stated that Grosvenor realized that his father was not mentally or physically able to attend to business. On September 22, 1921, Grosvenor wrote a letter to Samuel Riker, Jr., who represented the testator. Mr. Riker sent a copy of this letter to the decedent. In this letter he refused to consent to have his mother's will proved, and claimed that a large amount of money was due him, and threatened to bring suit, which he did shortly after. It seems to me that it clearly appears that from 1914 to 1921 Grosvenor was making an unjust and unwarranted claim against his father in regard to the business. In January, 1916, he had his father examined as to his sanity by subterfuge. Perhaps the old gentleman never knew of this at the time, but he certainly knew just before the firm was dissolved that his son claimed he was insane because he so stated. The firm was dissolved on July 21, 1916. A few months before this, Grosvenor formed a corporation of his own and began business across the street from the old place of

26

business, and on August 1, 1916, he sent his father a letter notifying him that his new company represented nearly all the old agencies in Europe formerly controlled by his father. The evidence is undisputed that the son had arranged with great care for getting this business for a year or more prior to this time. The claim is made that the son was justified in doing this in order to save the business from going elsewhere. At all events, the son accomplished it against the efforts of the father, for on September 15, 1916, we find that the father wrote letters to the foreign houses protesting against the action of his son, and before this the son George, who was in Europe in August, 1916, wrote the testator that they had discovered that Grosvenor had been making plans to get these agencies for over a year before. Prior to the dissolution of the firm, efforts had been made to settle the differences between them, and a contract had been drawn up and the testator had examined it, and it was then sent to Grosvenor. His actions with reference to this certainly admit the argument that he did not sign the agreement or help it along because he was anxious to have the firm dissolved. After the dissolution in 1916 the son made further attempts to get one or more other agencies formerly controlled by his father. He prevented his father from continuing in the old place of business, and, for a time, he was compelled to take another place. His actions with reference to certain former employees, immediately after the dissolution, certainly did not show any regard for his father's feelings. His father organized, later on, another corporation, and, on March 8, 1918, Grosvenor wrote a letter practically accusing his father of dishonesty. The contest of his mother's will came on in 1921. Grosvenor signed the objections to the proof of this will on October 15, 1921, prior to the date of testator's last will. In it he charges that his mother's will was made through the fraud, coercion and undue influence practiced upon her by her husband.

I have not attempted to cite all of the evidence showing the relations between Grosvenor and his father during this period. Enough has been referred to, I think, to show that there was substantial basis for testator's belief that his son was disloyal, untruthful and was trying to destroy his business. If this be so, it follows that the evidence fails to show that the testator was laboring under, and the will was the result of, an insane delusion in this respect, and no issue was presented for the determination of the jury.

As to the claim that an insane delusion possessed the testator that Grosvenor was actually trying to kill him, I doubt if the evidence is sufficient to show such a belief on the part of the testator, but, even if the testator entertained this belief, and it be

regarded as an insane delusion, it will not invalidate the will, unless it is shown that the will was the result of such insane delusion, and that no other reasons existed for the making of the will disinheriting Grosvenor. (*Merrill* v. *Rolston*, 5 Redf. 220; *Dobie* v. *Armstrong*, 160 N. Y. 584.)

In my judgment, it clearly appears that other facts did exist sufficient to form a basis in fact for testator's hostile feelings towards his son, and it was not shown that the will was the result of an insane delusion that Grosvenor was actually trying to kill the testator.

The decree of the Surrogate's Court of Suffolk county should be affirmed, with costs payable out of the estate to all parties appearing and filing briefs in this court.

KELLY, P. J., and MANNING, J., concur; RICH, J., dissents and votes for a new trial; KAPPER, J., reads for reversal.

KAPPER, J. (dissenting). I dissent and vote to reverse the decree setting aside the verdict and admitting the will to probate. There was substantial and ample competent evidence of the testamentary incapacity of the testator as affecting the contestant which required the submission of the case to the jury. Such submission as made by the learned surrogate merits approval. That the testator suffered from delusions regarding the contestant for several years prior to the first disinheriting will seems to have been established by a large number of lay witnesses as well as medical experts. The inferences that were to be drawn were for the jury, as is evidenced by the widely divergent views, based upon inferences, of the respective counsel on this appeal. It was not a question of law as to what the testator meant in his repeated references to the contestant's purpose to kill him, covering a period of time long before the first disinheriting will. His meaning, in the circumstances, was a question for the jury. The attitude of the contestant with regard to the business in which he and the testator had been engaged for many years, evidently built up to the testator's great profit by the industry and attention of the contestant, was a subject to be considered by a jury in the light of the persons surrounding the testator who were likely to profit from the testator's business to the material harm and disadvantage of the contestant. I am satisfied that the proof did not establish, as a matter of law, any act upon the part of the contestant toward obtaining the foreign agencies, but that the placement of such agencies in the hands of the contestant was the result of the free choice and desire of the foreign houses whose business interests were, in their estimation, likely to be imperilled if not cared for by the contestant. In *American Seamen's Friend Society* v. *Hopper* (33 N. Y. 619) the testator's

wife had him arrested under a charge of assault and he was obliged to give bail to keep the peace; and about the same time his wife left him alleging that he had committed violence upon her person and soon afterwards commenced an action for separation upon the charge of cruel treatment coupled with an allegation that it was unsafe for her to live with him. This conduct of the wife preceded her disinheritance by the testator's will. And the court held that the testator was not justified in his act of disinheritance for the reason that the conduct of the wife was superinduced by his delusions affecting her. In the case at bar, the testator's antipathy to the contestant, one of the natural objects of his bounty, was, I think, under the evidence, an insane delusion and he was not rendered *compos mentis* because the contestant sought, properly, to protect himself in the business which his labors had so largely built up. The case of the contestant could not have been affected by either the copartnership action or the contest of the mother's will, as both of them were subsequent in point of time to the date of the last disinheriting will. The inclusion of the testator's grandchildren in his declaration of disinheritance, wholly unnecessary, was a strong indication of the workings of an abnormal mind. I think that the case was properly disposed of by the surrogate's submission to the jury, and that he should not have set aside the verdict and directed probate of the will. When there is substantial evidence creating a question of fact in a will contest, the law gives the contesting party a right of trial by jury, and of this he should not be deprived by an admission of the will to probate contrary to a jury's verdict that there was a real and proper basis for the contest.

Decree of the Surrogate's Court of Suffolk county affirmed, with costs payable out of the estate to all parties appearing and filing briefs in this court.