In the Matter of the Estate of LILIAN EMMA KIMBALL, Deceased.

Surrogate's Court, Westchester County, July 6, 1935.

*Charles T. Lark* [*Sydney G. Soons* of counsel], for the proponent.

*McLaughlin, Russell & Bullock* [*Frederick C. McLaughlin* and *Ralph A. Bullock* of counsel], for the contestant.

*Stewart & Shearer*, for Barnard College, legatee.

SLATER, S. In this contested will case, the framed issues have been heretofore decided in favor of the will, except the one of testamentary capacity. The decedent, Lilian E. Kimball, was a maiden lady of fifty-nine years. She was born in Boston, Mass., on April 3, 1876, the child of Edward R. Kimball and Emma D. Kimball. She died in the Harlem Valley State Hospital, located at Wingdale, N. Y., on January 14, 1935. She left as her only distributee a brother, the contestant herein. The estate is of the value of about $40,000, acquired in part from her mother and father and in part through her own savings.

The contention of the brother is that at the time of the will making on October 9, 1925, ten years before her death, his sister was suffering from dementia præcox paranoid, was irresponsible, made irrational statements and did irrational acts. The evidence runs the gamut and becomes the story of this lady's life from the cradle to the grave.

The contestant further says that the will should be denied probate " because of the gross injustice in having one-half of the modest patrimony of this fine old New England family diverted from family uses and needs into a Fellowship for the post graduate education at Barnard College of Spanish women who are Protestants or Freethinkers." The answer to this is that the law permits persons to make their own wills.

The parental home was in one of Boston's suburbs. The father was a broker, had a seat upon the Boston Stock Exchange, and transacted business in the city of Boston. He was a pious-minded man and devoted to his church, wherein he was the superintendent of the Sunday School, the leader of the adult Bible class, and gave much time to his church matters. The brother was the elder by five years, having been born in 1871. When the decedent was born in 1876 the home was made up of the mother, father and the brother. The brother lived there until October 14, 1896, when he married and left to provide a home for himself and his wife. The decedent was then twenty years of age. When the decedent arrived at the age of eleven years, the mother became mentally unbalanced after giving birth to a child in 1887. The mother remained in the home. She was later declared mentally incompetent but remained in the home until October 7, 1905, when she was sent to the State Hospital at Taunton, Mass. She was then fifty-four years of age. At that time the decedent was twenty-nine years old. When the mother was away on summer vacations the decedent accompanied her and cared for her. The evidence is that no outside help was brought in, except to do the heavy work. Therefore, the picture is that the decedent, from the time of young womanhood until

1905, had the care of the home, charged with the very sad duty of caring for this afflicted mother, while the father attended to his daily business and to his work at the church. Finally, when the mother became too ill to be kept longer in the home, she was taken to the Taunton State Hospital where she ended her days on March 18, 1924, without having ever returned home. The decedent attended school and graduated from the Boston Latin School. She was, however, denied college, much as she desired it, largely because of the need of her presence at home, and the refusal of the father to take on help which would permit her to attend college. It was not until 1907, when she had reached the age of thirty-one and the mother had been placed in the asylum, that she was permitted to enter college, graduating from Radcliffe College in 1911 at the age of thirty-five. She visited Spain in 1911 to 1913. For the school year 1915–1916 the decedent taught French at the Hillside School for Girls in Norwalk, Conn. The father died in August, 1916. Thereafter, in 1921, she visited Europe, traveling in Spain because she had majored in Spanish and spoke the language fluently. She returned to America and resided in New York city. On October 9, 1925, she executed her will by attending upon her attorney, Mr. Charles T. Lark. By the will she gave to her nephew, the son of the brother, personal property consisting of jewelry, rugs, pictures and the like, as well as a painting of one of her ancestors. She gave her brother, her only heir, a life estate in all her remaining property and then gave the remainder to Barnard College in trust, the income from the fund to be used for an annual fellowship to be awarded to a woman from Spain or some one of the Spanish-American countries, with certain directions for making the award of such fellowship. It was her precatory wish that in the award of such fellowship, in so far as practical, preference should be given to Protestants or Freethinkers, the holder of such fellowship to spend the academic year as a student in Columbia University or some other institution designated by the governing body of Barnard College. The will provides for certain powers to be granted to the executors affecting the administration of the estate. The evidence discloses that she had had in mind to go to Europe for several months before the execution of the will, and directly after the execution of the will she embarked for a stay abroad. The year 1928 found her in London where she had a mental breakdown. Her return to this country was in the fall of 1929. She lived alone in the Wykagyl Apartments in New Rochelle until 1932. From there she was taken to Grasslands Hospital and from Grasslands was committed to the Harlem Valley State Hospital. Photographs show that the decedent was well developed and erect in appearance, and the medical

record shows that she was strong, robust and physically well. So much for the general statement of facts relating to the decedent's life.

The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. What is meant by " sound and disposing mind and memory " which this decedent must have had on October 9, 1925, in order to make a will to be admitted to probate? At the time of the testamentary dispositions, was her mental intelligence, memory and judgment perverted, the power of volition so inactive, or mental thought so irrational as to make the act of will drafting illegal? The mind of the testatrix, as to its thinking and judging powers at the time of executing the instrument proposed for probate, must have been clear enough to be capable of knowing about her property with some degree of judgment and discretion. She must have retained sufficient active memory to collect in her mind, without prompting, the necessary elements of the business to be transacted and to hold them a sufficient length of time to understand their relations to each other and to form some rational judgment in relation to them. The testatrix must have had sufficient memory to hold in her mind those persons who were near and dear to her or who were the natural objects of her bounty. (*Delafield* v. *Parish*, 25 N. Y. 9, 44; *Matter of Heaton*, 224 id. 22, 29; *Matter of Delmar*, 243 id. 7, 14; *Burke* v. *Burke*, 193 App. Div. 801, 806.)

It is the contention of the contestant that his sister was affected by the disease dementia præcox paranoid (if she suffered from it at all), which may have had its origin through influences of heredity because the mother died of such a mental ailment. No expert evidence was offered that such disease is hereditary or transmissible. The fact stands alone. The contestant touched upon the fact that in 1916, just prior to the father's death, decedent had told members of the family that her father had not treated her well and that her younger life had been circumscribed too much by her mother's sickness and the father's domination. She had also written a letter to this effect. The contestant claimed that this was a delusion and pointed to that as evidence of her incapacity to make a will on October 9, 1925. The delusion, if it was such, did not enter into the warp and woof of the instrument because, at the time of the will making, the father had been dead for nine years. The law is that a delusion affects testamentary capacity only when it enters into or controls in some degree exercise of the testamentary will against a person who stands in the relationship of an heir. (*Matter of Heaton, supra*, p. 29; *Matter of Nicholas*, 216 App. Div. 399 [2d Dept., Justice YOUNG writing for the court]; *Matter of Stern*, 235 id. 60; affd., 261 N. Y. 617.)

If there is any basis in fact to support a delusion as termed by the contestant, it cannot be said that the mind is diseased in that respect. (*Matter of White*, 121 N. Y. 406; *Matter of Nicholas, supra.*)

I hold that there was substantial basis for the testatrix's belief that the father had been oppressive; that her education at college was retarded; and that there was substance for the thought that she did not get out of her young life the things that she should have had from him, based on the facts heretofore recited with regard to her mother's insanity and stay at the home. The surroundings were depressing and exacting.

The father died in 1916 leaving a will probated in Suffolk county, Mass., in which he named the decedent and her brother as executors. Letters testamentary were issued to the two children and they engaged in the work of settling the estate. The final account of proceedings of the brother and of this decedent as such executors was for a period beginning the 1st of August, 1916, and ending the 11th of December, 1925, *two months after the making of the will.* They accounted for property of the sum of $33,000; they paid the inheritance taxes and made distribution as disclosed by the account of proceedings. The contestant, the brother, the coexecutor, never questioned his sister's sanity in December, 1925. He permitted the court to make the decree of distribution.

While the mother was in the asylum, the brother, Edward R. Kimball, Jr., acted as her guardian by appointment of the court. From time to time he made reports of his stewardship to his sister, the decedent, and the report and schedules annexed of his dealings with the estate amount to the round figures of $46,000. These reports were submitted to the decedent from time to time, the last one being presented to her on March 18, 1924, with the court making its final decree thereon on April 24, 1924. The mother had died on March 18, 1924, permitting the final decree of guardianship as hereinbefore stated.

Edward R. Kimball, Jr., the brother, was appointed administrator of the mother's estate by the Probate Court of Suffolk county, Mass., upon a petition dated March 24, 1924. He made his first and final account as such administrator on *May 18, 1928*. The account was allowed by the court and the administrator's report says that " the undersigned, being all the persons and the only persons interested, having examined the foregoing account, request that the same may be allowed without further notice. (Signed) Edward R. Kimball — Lilian E. Kimball." The account indicates that the father's stock exchange seat was sold in December, 1925, about the time when the decedent was writing to him about it; that the stocks and jewelry of the estate were distributed on August

20, 1925, one-half to himself and one-half to the decedent; that cash was distributed from June 2, 1924, to *May 18, 1928* (two and one-half years after the will making), to the decedent, Lilian E. Kimball, in the sum of $23,540.27. I assume that the administrator went on the theory that he was making distribution to a sane distributee. If he had other ideas he did not call them to the attention of the probate court.

This line of evidence with regard to the executorship; the accounts by the brother as guardian to the decedent because of her one-half ownership in the mother's estate; the account of the brother as administrator of the mother's estate, are all evidences of business transactions had with the decedent by the contestant at a time when the contention is made that the decedent was too incompetent to make a will. She was competent to transact this line of business with the brother, the contestant. Proof of this character — the transaction of business affairs with judgment and discretion — is considered very strong, if not conclusive, evidence of testamentary capacity. (*Matter of Sullivan*, 216 App. Div. 266, 267 [2d Dept.].) They are admissions or declarations by the contestant which are difficult to overcome.

There were received in evidence, offered by the contestant, thirty-eight original letters from the decedent to the brother, running from July 10, 1916, to January 11, 1930. It appears from the letters that the decedent returned from Europe in the spring of 1924, and she wrote her brother from the Prince George Hotel in New York. In the letter of September 21, 1925, just prior to the will making, she wrote the brother from the Women's University Club in New York city, telling how she had attended to her business affairs in connection with the visits of her banker and broker. She stated that she had paid for her passage and her baggage was being marked for sailing. She referred to several things about New York city; told about disembarking at Palermo in Italy and what they were going to see; that later on she was going to Tunis; whom she was to meet; the fact that she had made a codicil to her will while she was at Nice; a chiding to the brother because of delaying so long in selling the exchange seat of the father and certain copper stocks. These letters were received to be considered upon the question of her mental strength. From a reading of the entire lot of letters, I gain the impression that the decedent was a woman of education, of intellectual development, learned in the art of writing wit and satire, a keen observer. Altogether, these letters stand for more than spoken words in support of her sanity at the time she executed the paper writing. They refute the testimony that the decedent was mentally incompetent in October, 1925.

Miss Ruth May Wilson, the dean of the Hillside School at Norwalk, and a teacher in 1914, testified that she knew the decedent when she taught French in that school in 1915–1916 and that she conformed to the usual regulations of the school as she observed her. She had visited with her in New York city in the spring of 1925 and together went to the play, "The Show-Off." At that time the decedent talked to her about a contemplated will and told her she intended to leave her property to Barnard College for a fellowship for the education of Spanish women. She saw the decedent again in July, 1928, in London, and later visited her at the Wykagyl Apartments in 1930, and again as late as the spring of 1931. She characterized her as neat and clean. She observed nothing irrational in her words or acts.

There was correspondence offered in evidence from the decedent to her friends. There was business correspondence in 1921 and on August 29, 1924, with the Bankers Trust Company which represented her in some of her financial matters, indicating that she was transacting business and dealing with her stocks, bonds and investments — all business transactions.

Miss Louise Rodenbeck testified for the will. She is a professor in the Lake Erie School, Painesville, Ohio. She had met the decedent at Columbia University in 1918 and 1919 while the decedent was studying Spanish and preparing for her A. M. degree. She saw her again in June, 1924, at Biarritz for several days. She characterized all her acts and sayings as rational.

Miss Grace G. Lyman, a teacher in biology at the Julia Richman High School in New York city, testified that she met the decedent in August, 1925, just before the will making. She had several conversations with her and she characterized all her acts and sayings as rational.

Mr. Charles C. Gardner, the treasurer of the Bankers Trust Company in New York city, testified that he had letters from her in 1925 and 1926 and met her in October, 1929, when she came to the bank to express her thanks for the service rendered to her through the London office of the trust company while she, the decedent, was in London. He observed nothing irrational in her acts or conversation.

The deposition of Mr. Arthur W. Mellows, the representative of the Bankers Trust Company in London, was to the effect that he had occasional conversations with the decedent on May 16 and on September 12, 1929, and he characterized her acts and statements as rational at that time.

Apparently, the decedent had either written to or talked with Dean Virginia C. Gildersleeve of Barnard College, because on

October 2, 1925, the dean wrote Miss Kimball referring· to " my suggestions regarding the statement in your will about the proposed Spanish-American Fellowship are as follows," and she says, " I hope that this meets your desires. It seems to me to include approximately all that you need to say." She then expresses deep appreciation " of your generous purpose." On October 4, 1925, five days before the will making, the decedent wrote Dean Gildersleeve a letter in which she in part said: " Your prompt and singularly comprehensive suggestions for Mr. Charles T. Lark's use in stating the requirements for my proposed Spanish fellowship are deeply appreciated. They fit precisely my needs. My underlying purpose since 1911 has been to cooperate somehow with the devoted work I saw being started in Madrid for training Spanish women. Then the War interfered with the direct continuity of my Spanish interests. I cannot regret, however, the chance it brought to teach French at Hillside School, Norwalk, Ct., a year, secure a Columbia A. M., and become involved in the education of a most promising little French girl in Franche Comte near Besancon." She speaks about living in the south of France and Spain and that she is about to spend a couple of years leisurely comparing the climatic and other advantages for permanent residence near Toulon or a flat in Madrid. " Whatever I decide to be most feasible for living purposes, I have now left part of my heart behind me at Barnard irrevocably."

The will was not the result of a sudden impulse but of a definite purpose formed for some time before its execution. (*Matter of Donohue*, 199 App. Div. 466, 470.)

The contestant offered the record of her entry in 1932 in the Harlem Valley Hospital and the subsequent record of her case seven years after the will making. It was received over objections. Depositions were taken regarding the decedent's behavior and mental breakdown in 1929 in London, long after the will making. This was her first mental break. There is no evidence at all that proves otherwise. This was nearly four years after the will making. The decedent, up to this time, had been normal unto herself. (*Matter of Martin*, 82 Misc. 574, 580.) The court took all the evidence offered by both sides relating to events long before the will making, as well as after.

Mary E. Pike, a cousin on the Kimball side, was offered as a witness by the contestant to testify regarding a visit in 1914 at Worcester when the decedent said that she did not love her mother, that the mother did not do anything for her except to keep her clean, and she, the witness, thought that such statement was irrational.

The visit lasted two and a half hours and the witness stated that all the other conversations were, in her opinion, rational.

A witness for the contestant, a Mrs. Margaret A. Dock, an inveterate traveler, met the decedent in Granada, Spain, in November, 1911, and in Seville, Spain, in December, 1911. The decedent was taking Spanish lessons. She observed her kicking at a church door where both she and the decedent desired to enter. It is difficult to get into some churches. The decedent told her that her father was the cause of much unhappiness in her life. In November, 1914, she met her again at her own home and again in 1915 and 1916 in New York. She never saw her after 1919.

Miss Lillian A. Scott, a teacher of English, was a witness for the contestant and letters were offered which were written to her by the decedent in September and October, 1925, and December, 1925. Counsel for the contestant contends that these letters show lack of capacity to make a will. Having in mind the difference between medical sanity and legal sanity, I must conclude that these letters were written by a person highly competent to make a will. This witness saw the decedent last in April, 1932, when she visited her at the Wykagyl Apartments. She took luncheon with her and another friend. They had plenty of food for luncheon, but, because the decedent served the food herself from the kitchen, the witness concluded that such act of the decedent (serving from the kitchen) was irrational. The witness apparently did not understand New England ways and methods.

The contestant offered in evidence two letters from the father to the decedent under date of January 31, 1916, and March 2, 1916, in answer to Lilian's letters which were not offered in evidence because they could not be found. These letters indicate a possible friction at that time between the father and daughter. The contestant points to that fact as an indication of delusion. These letters were not originals, but old-fashioned letter press copies from a book found in the possession of the executors of the father's estate and used in his general course of business in his lifetime.

This leads up to the point in the case where the alienists come in — those gentlemen who are willing to testify and characterize without even seeing a decedent. An alienist was called by the contestant and to him was propounded a hypothetical question from the testimony of contestant's witnesses and documentary proof, and not the proof presented by the proponent. The alienist made answer to the question propounded. His real base for such a conclusion was the hospital record of 1932 and the London incident of 1929. He said the decedent was suffering from dementia præcox paranoid in October, 1925. He said the decedent was

performing an irrational act in October, 1925, when she executed her will. He was asked if the gift to the nephew was an irrational act. He said it was rational. He was asked the same question with reference to the gift to the brother and he said it was rational. He was then asked to characterize the gift to Barnard College for the benefit of Spanish women and he said that was wholly irrational. He was asked, if the gift had been to Barnard College for general educational purposes, if it would have been a rational act and he said it would.

The alienist for the proponent was present in court and heard all the evidence. In answer to a hypothetical question and having read the letters from the decedent to her brother, he testified that, in his judgment, the decedent, on October 9, 1925, was " in normal health at that time." That what she was suffering from in 1932 upon her admission to the Harlem Valley Hospital was manic-depressive insanity, and not dementia præcox paranoid; that the hospital record which was in evidence and upon which the other alienist had predicated his testimony that she was suffering from that disease in October, 1925, did not contain sufficient evidence of such fact to so characterize her disease in 1932.

These opinion physicians, of course, never saw the decedent and such evidence has never been regarded of much probative force. (*Dobie* v. *Armstrong*, 27 App. Div. 520, 526; affd., 160 N. Y. 584; *Matter of Eno*, 196 App. Div. 131, 150; *Matter of Meade*, 200 id. 346, 353 [2d Dept.].) The testimony of a physician in answer to a hypothetical question as to lack of testamentary capacity is insufficient to overcome the evidence in favor of her capacity. (*Matter of Delmar*, 214 App. Div. 500.)

The contestant would have the court deny probate on the authority of *Matter of Martin* (82 Misc. 574). No will has a twin and neither has a probate case. The facts of the *Martin* case are not our facts by any means. The surrogate (at p. 596) said that the *Martin* case was the first case where the decedent was afflicted with manic-depressive insanity. The proof was plenty that such was the case before Martin made his will. There is no evidence to point to in the instant case of the decedent's being afflicted with this malady so described by an alienist, prior to 1929 — four years before the will making. A great mass of evidence overwhelmed such a conclusion.

Even if the testatrix was insane in 1932, years subsequent to that of the will's execution, it cannot affect its validity. The test is the state of mind on October 9, 1925, and even then, isolated and independent acts are no reliable estimate of one's mental condition. If difference in religious views, search of knowledge of ancestors,

and statements made about them, show a lack of testamentary capacity, I guess only a few wills would stand up against attack.

There appears to have been deliberate and careful consideration of the will for a period of years as indicated by the talks with friends regarding the charitable gift. It was evidently the result of her knowledge of Spain, her visits there and the ability to speak the Spanish language and the desire to do some generous act for its people. This is not a case where the family was omitted. The brother was given a full life estate in the entire property and the nephew was remembered by gifts of furniture, pictures, etc. The final result displayed a highly intelligent purpose. The preparation and execution of the will was under the guidance of a reputable and experienced attorney. It is not for us to say how much should be given to those of the family. That was her affair, if mentally fit.

Giving due weight to all the evidence which was produced by the contestant and any inferences which might be drawn therefrom as to the testatrix's capacity to make a will, I would say that it is overcome, greatly overcome, by the actual demonstration of her mental processes and her knowledge and ability to deal with her own estate as shown by the documentary evidence. The burden of proof as to testamentary capacity has been sustained by the proponent.

Upon all the evidence, I hold that the testimony manifests a clear knowledge of the nature and extent of her property; that she knew the relation she bore to those who would be the natural objects of her bounty and knew and understood what she was doing when she executed the will and that she possessed testamentary capacity.

The motion of the proponent to decide the issue of mental capacity in favor of the will is granted. The will may be admitted to probate and letters testamentary issue.

Submit decree in accordance herewith.