**GREEN et al. v. DICKSON et al.**

No. 11938.

Court of Civil Appeals of Texas. Galveston.

Jan. 8, 1948.

Rehearing Denied Feb. 5, 1948.

Wm. H. Duls, of Dallas, Paul Boethel and Fertsch & Fertsch, all of Hallettsville, J. W. Ragsdale, of Victoria, Warren J. Collins, of Dallas, E. L. Klett, Executor, and Klett, Bean, Evans & Justice, all of Lubbock, for appellants.

Alton C. Allen and Walter W. Allen, both of Hallettsville, James N. Erwin and Dillon Anderson, both of Houston (Allen & Allen, of Hallettsville, and Baker, Botts, Andrews & Parish, of Houston, of counsel), for appellees.

MONTEITH, Chief Justice.

This action was brought in the probate court of Lavaca County by contestant E. L. Klett for the alleged purpose of determining which of the two wills of Mrs. Julia C. Green had been executed while she had

testamentary capacity and was free of undue influence. He alleged that he had been appointed independent executor and trustee under two sets of wills executed by Mrs. Julia C. Green, deceased, one on October 5, 1938, which will be referred to in this opinion as "the 1938 will", and another on September 11, 1945, which will be referred to herein as "the 1945 will", and that by reason of the advanced years of decedent and her declining mentality, a question had arisen as to whether the decedent was of sound mind and free from undue influence in the disposition of her property at the time of the execution of "the 1945 will" and the codicil thereto.

On July 11, 1946, Raymond Dickson filed an application in said action for the probate of the 1945 will.

On July 31, 1946, William Dickson Green, Jr., a minor, appeared therein by next friend and filed a contest of the application to probate the 1945 will.

On August 2, 1946, the will of September 11, 1945, and the codicil thereto were admitted to probate by the County Court of Lavaca County, from which action contestants appealed to the District Court.

On September 20, 1946, Mrs. Miriam Green filed in said action a suggestion of the death of William Dickson Green, Jr. She alleged that he had left no surviving heirs, and that she was his mother, and interested in his estate under Article 3315, Revised Civil Statutes. She prayed that she be made a party contesting the application for the probate of the 1945 will and codicil, and that those provisions of said will under which Mrs. Green had devised certain land and the remainder of her estate to Raymond Dickson in the event of the death of William Dickson Green, Jr., without issue, be not probated because of alleged undue influence and lack of testamentary capacity of the testatrix at the time of its execution. Raymond Dickson filed a motion to require Mrs. Miriam Green to show herself entitled to prosecute this contest.

At the conclusion of the evidence by all parties, the trial court instructed the jury to return a verdict probating the 1945 will and codicil and rendered judgment accordingly.

The controlling questions presented on the appeal are whether the testimony relied upon by contestants raised the issue of a lack of the testamentary capacity of the testatrix at the time of the execution of the 1945 will, and whether undue influence was brought to bear upon her at the time of the execution of the will.

Appellants complain of the alleged error of the trial court in instructing a verdict admitting the 1945 will to probate for the alleged reason that there was sufficient and competent evidence of probative force adduced on the trial of the cause to raise both the issue of the testamentary capacity of Mrs. Green at the time of the execution of the 1945 will, and the issue that the execution of said will was procured by undue influence.

Mrs. Julia C. Green was the surviving wife of William Green, who died in 1927. She was 82 years of age at the time of her death. There was born to Mrs. Green and William Green only one child, William Dickson Green, the husband of the contestant Miriam Green, who died in April, 1945, prior to the death of his mother. William Dickson Green and Miriam Green had only one child, William Dickson Green, Jr., who died on August 12, 1946, approximately two and one-half months after the death of Mrs. Julia C. Green. Raymond Dickson, proponent of the 1945 will, is the son of Mrs. Julia C. Green's deceased brother, Hamilton Dickson. When he was a child he lived in Mrs. Green's home after the death of his parents. There was a close personal relationship between him and his aunt.

The 920 acres of land devised by Mrs. Green to Raymond Dickson under the 1945 will was Mrs. Green's separate property. It had been acquired by her by either gift, devise or descent from her parents, and was called by her "the Dickson lands."

Under "the 1938 will" Mrs. Julia C. Green bequeathed to her son, William Dickson Green, a trust estate of $25,000, the income from which was to be used by him for the benefit of her grandson, William Dickson Green, Jr., until he became 25 years of age.

The will provided that if William Dickson Green, Jr., died before reaching the age of 25 years, leaving a child or children surviving him, the principal of the trust estate should go to the surviving child or children, but that, if he died before reaching the age of 25 years without leaving bodily descendants, all properties belonging to said trust estate should revert to and become part of the residue of decedent's estate, which was devised to her son, William Dickson Green, in fee simple. The will provided that if her son, William Dickson Green, died before the decedent, the balance of her estate would revert to the trust estate in favor of William Dickson Green, Jr.

By codicil to said 1938 will, of January 11, 1941, the life of the trust estate in favor of William Dickson Green, Jr., was extended until he reached 30 years of age. By codicil executed August 30, 1941, E. L. Klett was appointed successor trustee, and by codicil to said will of August 3, 1945, E. L. Klett was made executor and trustee of the will, and H. W. Wallace was appointed as successor in the event of his death, resignation, or failure to qualify.

By counter-points appellees contend the record shows that they have shown by clear, positive and affirmative evidence Mrs. Green executed the will of September 11, 1945, and codicil thereto with due legal fidelity; that she was a person of sound mind at all times material to its execution, and that contestants have failed, as a matter of law, to offer sufficient evidence to raise fact issues as to her testamentary capacity or that undue influence was brought to bear upon her at the time of the execution of the 1945 will.

By cross-points they contend that the trial court erred in admitting in evidence the opinions of Dr. Goodson and Dr. Hauser who, in answer to hypothetical questions and over their objections that the facts upon which the questions were based were not sufficient to warrant a conclusion of lack of testamentary capacity, and that the hypothetical questions failed to submit a complete, accurate or fair summation of the facts in evidence and that, therefore, the answers to said questions failed, as a matter of law, to raise a fact issue as to the lack of testamentary capacity and the exercise of undue influence upon the testatrix.

It is undisputed that prior to the execution of the 1945 will Mrs. Green wrote Raymond Dickson at Houston asking him to tell her family lawyer, H. W. Wallace of Cuero, Texas, that she wanted to discuss matters pertaining to her will with him. In August, 1945, Mr. Wallace called on Mrs. Green at her home in Shiner in response to a call from her maid. He testified that, at that time, she discussed with him the preparation of a new will and the final disposition of her estate; that she told him that, in the event her grandson, William Dickson Green, Jr., died leaving no descendants, she wanted the property devised to him in a trust estate in the 1938 will to go to some member of the Dickson family.

At Mrs. Green's request and under her instruction, Mr. Wallace prepared the September 11, 1945, will. In this will Mrs. Green made three specific legacies—a legacy of $5,000 to her niece, one of $10,000 to her friends Mr. and Mrs. Hughes, and a third to her nephew, Raymond Dickson. She bequeathed all the rest and residue of her estate to her grandson, William Dickson Green, Jr., in a trust which was to be paid to him when he reached the age of 35 years; that, at the termination of the trust, the corpus of the estate should be turned over to William Dickson Green, Jr., if living, and if not living, then to his child or children, in fee; that if he should die before the termination of the trust, leaving no child or children, the rest and residue of her estate should go to her relatives; $5,000 each to her niece and two nephews, if living, and the balance of her estate should go to Raymond Dickson, if living, and if he was deceased, then to his descendants, or institutions named by him in his will, but that, if he died leaving no issue and no will, the residue of her estate should go in fee to the then surviving descendants of the parents of the testatrix. E. L. Klett was named independent executor and trustee in the will, and H. W. Wallace was named his successor.

On the trial of the case contestants introduced in evidence the following testimony bearing on the issue of Mrs. Green's

testamentary capacity at the time of the execution of the 1945 will: a part of Raymond Dickson's testimony in the county court in which he testified in reference to a conversation with Mrs. Green in which she had stated that her will was out of date, or antiquated. They introduced the testimony of Ella Wolters, one of the subscribing witnesses to the February, 1946, codicil to the 1945 will, in which she stated that, in her opinion, Mrs. Green was a person of sound mind at the time of the execution of the codicil, but that there was a time when Mrs. Green did not know her. She did not recall whether this was before or after the signing of the codicil; and the testimony of William Zapp of Shiner, Texas, who testified that he had seen Mrs. Green twice during the time material to the execution of the 1945 will; that on August 7, 1945, on his and her birthday, she had been blue and had cried. He would not state that she was a person of unsound mind at that time. D. D. Martin of Lubbock, Texas, testified that he had done some work in connection with the Green estate; that he saw Mrs. Green at one time in November, 1945; that at that time, Mrs. Green seemed ill and weak and was not mentally alert, and it seemed difficult for her to carry on a conversation or understand the meaning of what was told to her. Mattie Bell Myers, a colored servant in the home of Mrs. Green, testified that Mrs. Green was of sound mind, rational, and apparently in possession of her usual normal mental faculties in August, 1945.

Appellants also offered in evidence the testimony of two physicians, Dr. A. Hauser and Dr. T. N. Goodson, who, in answer to hypothetical question submitted to them, testified that Mrs. Green was a person of unsound mind at all times relevant to this appeal.

They also introduced Dr. Harvey Renger, who testified, in response to another hypothetical question, that, in his opinion, Mrs. Green was not thinking clearly in January, 1946, or December, 1945.

The hypothetical question which was submitted to both Dr. Hauser and Dr. Goodson is extended and involved. It covers some eight pages of the statement of facts, and assumes much of the testimony introduced by contestants in reference to the testamentary capacity of Mrs. Green at material times and includes letters written by Mrs. Green to E. L. Klett. The question was, we think, subject to the objections urged by proponents that in some respects it contained an incomplete and inaccurate summary of the facts on which it was based.

On the trial proponents introduced in evidence six witnesses who testified to facts within their observation of and association with Mrs. Green during the summer and fall of 1945. They based their conclusions as to her testamentary capacity on these facts. Each of these witnesses testified that Mrs. Green was, at such time, a person of sound mind. No witness introduced by either party who saw her during that time testified that she was a person of unsound mind at the time of the execution of the 1945 will.

H. W. Wallace, the Green family lawyer for a period of approximately 45 years, who prepared "the 1945 will", testified that he had attended to the legal affairs for the Green family, including the affairs of Mrs. Green's husband and her son, since 1927; that he had been well acquainted with Mrs. Green for a period of 40 years, particularly the last 20 years of her life; that in early August, 1945, he had received a telephone message from her through a servant girl, requesting that he come to her home at Shiner; that Raymond Dickson had already advised him that his aunt, Mrs. Julia C. Green, desired his advice and services in connection with her will; that prior to the date of the execution of the will he had made three calls on Mrs. Green at her home in connection with the preparation and execution of the will; that during the first conference with her on August 13, 1945, lasting from one to two hours, they had discussed fully her business affairs, and that she had indicated to him her intentions as to the disposition of her property; that at the second conference, on September 3, 1945, she had suggested no changes in her earlier expressed intentions, but that she had decided definitely in regard to various details of the will and had given him final instructions for the preparation of her will,

which she signed on September 11, 1945. Mr. Wallace testified that Mrs. Green told him that she wanted to give the Dickson lands which had belonged to her parents to Raymond Dickson; that she had some specific bequests that she wanted to make to her relatives, and that she wanted the balance of her estate to go to her grandson, William Dickson Green, Jr. Mr. Wallace testified that in his third conference with Mrs. Green, on the date of the execution of the will, he called on Mrs. Green in the parlor of her home and read the will to her in its entirety, as it was written. That at her request, he had explained certain technical and legal terms contained in the will, and that Mrs. Green had considered and talked about the various features of the will in a careful and thoughtful way and had expressed herself as satisfied with the will he had prepared. He testified that later, on the same day, while he was still there, the will was executed before the two attesting witnesses, Dr. Frank M. Wagner, her family doctor, and Mr. Peck Welhausen, her family banker, and that Raymond Dickson was not present on this date. Mr. Wallace testified that on all occasions when he had seen Mrs. Green she was in a sound mental state, and that he had never seen her when her mind was not sound, and her memory good; that she knew the general size, extent and nature of her estate, the disposition she was making of it by the will which she executed September 11, 1945; that she was a person of strong will, and that in August and September, 1945, he observed no deterioration of her ability to express herself.

Peck Welhausen, of Shiner, Texas, one of the subscribing witnesses to the will of September 11, 1945, was cashier of the First National Bank of Shiner, Texas. He testified that he was 62 years old at the time of the trial, and had known Mrs. Green since he was six or seven years of age; that, on the day of the signing of the will, when he went to her home to witness her will, she was sitting in a chair in her parlor; that she asked him about his family and apologized for calling him away from his work; that, in answer to his inquiry, she stated that she was feeling very good.

He testified that from an observation of Mrs. Green, she was, in his opinion, a woman of sound mind, and that on such date "she had mental capacity to transact her business."

Dr. Frank Wagner, Mrs. Green's family physician, the other subscribing witness to her will, testified that he had been Mrs. Green's family physician for 20 years prior to her death; that during July, August and September of 1945, he saw Mrs. Green from one to four times per week on either professional or social calls; that during the summer of 1945, Mrs. Green was in his opinion a person of sound mind, and that she was not easily influenced; that he had never seen her when she was not a person of sound mind. He testified that immediately following the death of her son in April, 1945, she was grief stricken, but that this condition was not unusual or different from any mother's reaction to such a loss; that in June, July, August, September and October, 1945, she was perfectly normal mentally and physically, notwithstanding her grief. He testified that he had prescribed sedatives for her to relieve her of the ailments from which she suffered, but that she was not an addict to any narcotics; that she did not drink of alcohol whatsoever; that he had never seen her in a state of insane delusions except possibly the last few days before her death in May, 1946. He testified that when he went to Mrs. Green's home on September 11, 1945, in response to a telephone call from her, she introduced him to her lawyer, Mr. Wallace; that shortly thereafter Mr. Welhausen came; that Mrs. Green was sitting in a chair, fully dressed, and that she told him she wanted him to witness her will. He testified that Mrs. Green was as normal mentally as she had been for years before; that there was no question in his mind from what he saw of her that day about her being normal. Dr. Wagner testified that Mrs. Green was not a narcotic addict, though he had heard that she had at one time been addicted to morphine; that he knew definitely that for 20 years she had not had a drink of liquor and that he saw no indication of impairment of her faculties which could be ascribed to excessive use in earlier life of

liquor or morphine; that during neither May, June, July, August, September, 1945, did Mrs. Green show any signs of mental unsoundness.

Rev. J. A. Weaver testified that he was a Baptist minister, the pastor of Mrs. Green's church in Shiner; that he saw her frequently during July, August, and September of 1945, and that he had continued to see her until shortly before her death. He testified that within his observation Mrs. Green was a person of strong mind and a strong will; that he observed no change in her mental status until about two and one-half months before her death, and that then there was a gradual deterioration in her condition, but that during July, August and September of 1945 Mrs. Green had sufficient mentality to successfully manage and control an estate with a value in excess of $200,000.

Mrs. Ella Blohm testified that she had been Mrs. Green's nurse since February, 1945, and until her death in 1946; that she was with Mrs. Green every day during that time, with the possible exception of a few days in November, until Mrs. Green's death in May, 1946; that beginning in June, July and August, 1945, Mrs. Green's health was better than it had been in years, and that she required the administration of very little sedatives during that time. She testified that immediately after the death of her son, on April 30, 1945, Mrs. Green was prostrated with grief, and that she was mentally confused during that time, but that after about three weeks she had entirely recovered. She testified that during June, July, August, September and October, 1945, Mrs. Green was at all times a person capable of understanding the nature and extent of her property, and was very capable of thinking for herself; that she was alert mentally, and a person of strong will. She testified that after the execution of the September 11, 1945, will, Mrs. Green had told her what she had done in her will, and had stated that "what was hers in trust from her father, she wanted to go to her nephew, Raymond Dickson."

Mrs. Helen Kostler, a registered nurse of Shiner, Texas, testified that she had known Mrs. Green since 1935; that in 1945 she waited on her for about a week, relieving Mrs. Blohm. She testified that from her observation of Mrs. Green she was a person of strong mind; that she had never seen her when she was not a person of strong mind, except when she was unconscious a few days before her death.

It is the right of every citizen of this State to dispose of his property by will as he may desire, regardless of the ties of nature or relationship.

It is the established rule that, in determining whether an aged testator has sufficient mental capacity to make a valid will, the court should be controlled by testator's acts connected with the execution of the will, the reasonableness of its provisions, and his ability to detail the nature and extent of his property and to know the objects of his bounty.

"The test is not whether the person who has made testamentary disposition of his property was of a high order of intelligence, but the humbler test is applied, Did he know what he was doing with the property which he knew he owned when he executed his will, and did he perform the act of his own free volition, and because he desired to do so?" Salinas v. Garcia, Tex. Civ.App., 135 S.W. 588, 590.

A testator may be old and infirm, weakened in energy and impaired in his senses, but, if he responds to the test which is applied to human beings in the ordinary affairs of life, the disposition of his property will be respected. "It is not for juries nor courts to say how property should be passed by will. They can do no more than see that the testator's mentality meets the law's tests." Whitney v. Murrie, Tex.Civ. App., 264 S.W. 270, 274.

It was held in the case of Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292, writ dismissed, that, while contestants' witnesses testified that testatrix had a weak mind, was eccentric, and had some childlike ways, these conditions were not sufficient to justify annulling her will; that it was sufficient if she knew that the transaction in which she was engaged was the making of a will that conveyed her property at her death, and that she remembered the objects of her

bounty, and acted without improper influences. Citing the cases of Brown v. Mitchell, 75 Tex. 9, 12 S.W. 606; Salinas v. Garcia, Tex.Civ.App., 135 S.W. 588; Milner v. Sims, Tex.Civ.App., 171 S.W. 784.

In the case of Milner v. Sims, Tex.Civ. App., 171 S.W. 784, it was held that the fact that testatrix was old and feeble, that her memory had become faulty and her mental faculties somewhat impaired, was not sufficient to warrant a court in setting aside her deed or will; that the right of a grantor to dispose of her property according to her own wishes was just as sacred, and should be guarded with as much care, as any rights due to the living.

The case of Rudersdorf v. Bowers, Tex. Civ.App., 112 S.W.2d, 784, 785, involved facts similar in many material respects to those in the instant case, in that contestants depended largely upon long and complicated hypothetical questions to witnesses who had had no personal acquaintance with the testator and had not seen him at or near the time the will in question was executed.

In that case this Court, speaking through Justice Cody, held, in substance, that an instructed verdict for proponents was proper, and that the fact that the testimony indicated some delusional trend in testator's mind had no bearing on his testamentary capacity.

In the instant case all witnesses who were with Mrs. Green at the time she signed "the 1945 will" based their conclusions that she was normal mentally and a person of sound mind at the time she signed the will upon personal observations of her actions, demeanor and remarks at or near the time of the execution of the will.

The two doctors who testified in answer to hypothetical questions that Mrs. Green was a person of unsound mind at the time of the execution of the 1945 will testified that they had never met Mrs. Green and that they were testifying entirely from facts they were asked to assume in hypothetical questions.

Dr. Harvey Renger testified that in December, 1945, or January, 1946, some three or four months after the 1945 will was executed, that Mrs. Green "was not thinking clear."

The above decisions by the Courts of this State are, we think, controlling in this appeal. They establish that the evidence of lack of testamentary capacity in this case falls short of affording a legal basis for a finding on that issue.

Decisions from other jurisdictions have adopted a similar view: In 32 C.J.S., Evidence, § 569h, the general rule is stated to be that: "An opinion may possess evidentiary weight or probative force sufficient to take the question of mental capacity to the jury, but it is entitled to little or no weight as against positive facts to the contrary."

In the same text, at page 404, it is said: "The opinion of an alienist or medical expert who has never seen the subject and who testifies in answer to hypothetical questions has been held to be weak and unsatisfactory evidence, of little probative force, and it has been stated that it should be received with caution and carefully scrutinized."

In the case of United States v. Hill, 8 Cir., 62 F.2d 1022, 1025, it is said:

"Necessarily, the weight of the opinion of an expert depends largely upon the facts upon which it is based. If supported by the evidence and by reason and common sense, it may carry great weight. If not justified by the evidence or by reason, it is entitled to no weight. Within reasonable limits, the weight of expert opinion is for the jury; but, if opposed to undisputed facts, common knowledge, and reason, it will not support a verdict. It is safe to say that an opinion rises no higher than the level of the evidence and the logic upon which it is predicated.

"In 22 C.J., page 733, the text-writer says: 'But the judgment of an expert, when opposed to undisputed facts and the dictates of common sense, will not support a verdict, and the court should not permit the jury to be influenced by evidence on which they could not, within the laws of correct reasoning, make a finding.'"

In Nebraska, in the case of In re Kajewski's Estate, 134 Neb. 485, 279 N.W. 185, 193, the Supreme Court of that State said: "Where there is evidence in the record,

as in this case, that the testator actually made a will and disposed of his property according to his own wishes, and that he accumulated his property and was able to take care of it and other ordinary transactions of life, the opinion of the expert, based solely upon a hypothetical question, is not sufficient to require that the issue be submitted to the jury."

In Arkansas, in Puryear v. Puryear, 192 Ark. 692, 94 S.W.2d 695, 699, the Supreme Court said: "These opinions can rise no higher than the facts upon which they are based. The facts testified to by the witnesses bear no just relation to the opinion expressed by them, and the Court should have sustained appellants' objections to their expression. * * * 'If the witnesses testify that testator is insane, but give as a basis for such opinion facts which do not justify it,. their evidence on this point is worthless, and can not support a verdict in favor of contestants.' Page on Wills, Vol. 1 (2d Ed.) § 698, p. 1173."

In Kentucky, in the case of Dossenbach v. Reidhar's Executrix, 245 Ky. 449, 53 S.W.2d 731, 736, the Court in its opinion said,

"It will be observed that the hypothetical question was based on scattered incidents detailed by many witnesses, covering isolated and widely separated occasions, and presented no question of science or medical skill. (Citing Barrett v. Brand, 179 Ky. 740, 201 S.W. 331; Gay v. Gay, 183 Ky. 238, 209 S.W. 11.)

"The answer of the doctor was not responsive to the question, it bore no rational relation to the subject involved, and it added no probative weight to the circumstances upon which it was predicated."

In New York, in the case of In re Kimball's Will, 156 Misc. 338, 281 N.Y.S. 605, at page 615, the Supreme Court said:

"This leads up to the point in the case where the alienists come in, those gentlemen who are willing to testify and characterize without even seeing a decedent. An alienist was called by the contestant and to him was propounded a hypothetical question from the testimony of contestant's witnesses and documentary proof, and not the proof presented by the proponent. * * *

"These opinion physicians, of course, never saw the decedent and such evidence has never been regarded of much probative force. (Citing authorities.) The testimony of a physician in answer to a hypothetical question as to lack of testamentary capacity is insufficient to overcome the evidence in favor of her capacity. (Citing authorities.)"

In Missouri, in the case of Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S.W.2d 72, 85, the Supreme Court of that State said:

"It follows that the opinions of the two experts based wholly and alone upon the facts and circumstances detailed in contestants' evidence do not constitute substantial evidence of testamentary incapacity. (Citing authorities.)

"As we have pointed out, the uncontradicted evidence shows that to the very day of the fatal stroke Mrs. Huthmaker was in active touch with, understood and intelligently carried on the ordinary .affairs of her life, was thoroughly conversant with and managed her property interests, investments, and business affairs, and upon this record there can be no doubt that she knew who her relatives were and how and to whom she was giving her property under the will."

Under the above authorities we think that the evidence as to Mrs. Green's lack of testamentary capacity at the time of the execution of the 1945 will, including the opinion testimony of the two physicians who based their opinions wholly and alone upon the facts and circumstances detailed in the hypothetical questions propounded to them, was not a sufficient basis in fact to show the mental incapacity of the testatrix to make a will, and that there was no substantial evidence upon which to authorize a submission of the issue to the jury.

Further, it is undisputed in the record that Raymond Dickson was not present at the time of the execution of the 1945 will, and there is no evidence in the record that he or any one for him suggested any feature of the will to either Mrs. Green or to Mr. Wallace, who prepared the will, therefore there was, we think, no error in the action of the trial court, either, in lim-

iting the effect of certain statements and letters of testatrix which were introduced in evidence to the issue of testamentary capacity, or in the refusal of the court to submit the issue of undue influence to the jury.

It follows that the judgment of the trial court must be in all things affirmed.

Affirmed.