J. K. PRIEM et al., Appellants.

v.

Emilie ADAMS, Appellee.

No. 10901.

Court of Civil Appeals of Texas.

Austin.

Nov. 29, 1961.

Rehearing Denied Jan. 3, 1962.

Fox & Fondren, Taylor, Vernon M. Pfluger, Austin, for appellants.

McClain & Stump, Georgetown, for appellee.

HUGHES, Justice.

This suit was brought to contest the will of John Priem who died in Williamson County, May 9, 1960, at the age of 91 years. The will was executed August 15, 1959.

The proponent and sole beneficiary [1] of the will is Emilie Adams, a daughter of testator.

Those contesting probate of the will, also children of testator, were Mary Klattenhoff, J. K. Priem, Paul Priem, Gottlieb Priem, Johanna Gunn, Richard Priem, Oscar Priem and Pete Priem.

The grounds of the contest were that testator lacked mental capacity to execute the will, and that he executed it as a result of undue influence exerted upon him by Emilie Adams.

These two issues were submitted to a jury which found that testator possessed mental capacity to execute the will, but that it was executed while acting under the undue influence of Emilie Adams.

All contestants except Oscar and Pete Priem moved for judgment on the verdict.

Proponent moved that the answer of the jury finding undue influence be disregarded for lack of evidence to support it, and that judgment be rendered sustaining the will.

The motion of contestants was overruled. The motion of proponent was granted.

Appellants are all of the original contestants except Oscar and Pete Priem.

■ All of appellants' points except number two relate to the lack or sufficiency of the evidence. They are that the finding of testamentary capacity of the testator was without any evidence to support it, and that it was against the great weight and preponderance of the evidence. Also, that there was sufficient evidence of probative force to sustain the jury finding of undue influence.

To avoid repetition, we will make one statement of the material evidence in disposing of these points.

Mr. W. K. McClain, the attorney who prepared the will for testator, testified that in August, 1959, Mrs. Emilie Adams and her daughter, Mrs. Otis Daniel, came to his Georgetown office with a note signed "John Priem:" reading: "I would like to talk to you sometime if you can come to Round Rock."

Mr. Priem at that time .was living near Round Rock with Mrs. Emilie Adams and her husband.

This note was actually signed by John Priem, but the body of it was written by Mrs. Daniel.

Mr. McClain, being informed that Mr. Priem desired to discuss with him the making of his will and not being acquainted with Mr. Priem, suggested that Dr. H. R. Gaddy, a Georgetown physician, visit and examine Mr. Priem and advise him, Mr. McClain, if it would be proper for him to visit Mr. Priem and talk with him about his will. Dr. Gaddy did as requested, and reported to Mr. McClain that it would be proper for him to talk with John Priem, that "it was all right with him."

---

1. Except for $1.00 bequests to the other children.

Within a day or so Mr. McClain visited Mr. Priem. We quote from his testimony regarding this visit:

"Q. Can you briefly describe Mr. Priem's physical appearance and condition to the jurors? A. Well, now, I had already ascertained that he was 90 or 91—90, I believe, 90 years of age; and when he came in, he was a man that I would say was of that age; he came in; he walked rather briskly and he walked rather spry; he had a cane in his hand; he came right on in, and I got up out of my chair; he walked right up to me and shook hands with me and told me he was John Priem, and I told him who I was, and I suppose he was expecting me and—

"Q. Did he have a difficulty with reference to his hearing, Mr. McClain. A. John Priem had a difficulty and a physical defect in his hearing. One ear, apparently, he could hear out of, and the other one, he couldn't hear out of, and you had to talk very loud to him. He sat in the chair, and I sat down on the sofa right by him, and I had to talk very loud for the old man to understand me.

"Q. State the substance of your conversation with Mr. Priem at that time, Mr. McClain. A. Mr. Priem stated to me that he wanted me to prepare a will for him, and I told Mr. Priem that I could prepare one for him, but that it was customary for the attorneys to talk to their client and find out all the information regarding this old gentleman, and we sat there and I asked Mr. John Priem who his children were and he told me—about, after about fifteen minutes of talking there, he told me. He named all of his children over to me. I asked, furthermore, asked Mr. Priem about his property, how much property did he have. He told me he owned a little farm over in Travis County, and I asked him how much it was, and he told me that it was about 130 acres of land that he owned, that he and his wife had bought this land during their lifetime, and that he owned a one-half interest in this farm, and I asked him if he had any other property, and he said no, this was the main property that he had; this was practically—for all practical purposes, all that he had, was the one-half interest in this farm.

"Q. Did he tell you how he wanted to dispose of his property, Mr. McClain, in his will? A. Yes, sir. Now, I, of course, as all attorneys will do, on occasions of this kind, we ask him who his children are, whether his wife was living, and she was dead, and I asked him what did he want to do with this property; what did he want to do with it; and he told me he wanted to give this property to Mrs. Adams, the woman he was living with, Mrs. Nils Adams, I believe her name is Emilie Adams.

\*    \*    \*    \*    \*    \*

"A. Yes, sir; I asked him about his other children and those that he had mentioned to me and—

"Q. What did he tell you? A. He said he loved those children; he loved all of his children, but he said this, that 'This woman here has taken care of me, and she has built me a home here, a little room here for me to live in, and she has been good to me, in looking after me, and I think she is entitled to it;' and that was the way he left it with me."

Mr. McClain prepared the will in accordance with the desires of the testator and on the day following the above visit, Mr. McClain took the will to the testator for execution. As to this visit, we quote Mr. McClain:

"A. Mrs. Adams was there, and I asked her if I could see Mr. John Priem. I sat down in the front room again, and she went back out to the back; this little house he was living

in was out about 30 or 40 feet behind the house. A few minutes, Mr. Priem came in, and I told him that I had prepared the will in line with what we had discussed, and we sat down in the front room, and I read this will over to this old gentleman, just taking it word by word, and putting it in his ear, and when I got through with it, I would ask him, 'Now, is this what you want; is this the type of will that you want?' And the old gentleman told me that was the—that was what he wanted to do with his property; that was the kind of a will that he wanted. It was the same—it was drawn exactly as he had told me the day before. I tried my best to draw it just exactly the way the old gentleman wanted it.

"Q. What was the next thing you had done after you had read the will to Mr. Priem and explained it to him, and he told you it was what he wanted? A. Now, I asked Mr. Priem and I told him that we would have to have two witnesses to this will, and did he have any preference as to who would be witnesses on this will. I told him I would go and get any witnesses he wanted. He said, well, he had known Judge Wayland, who was the Justice of the Peace at Round Rock, and that he knew Mr. Robinson, who ran a store across the street, and said those witnesses would be all right; if I would go out there and get them and bring them back, why, he would like for them to witness the will, and I did that."

Mr. McClain testified that he went for and brought the persons named by testator to the Adams house to witness the will, and that testator, Mrs. Adams, the witnesses and he were the only persons present when the will was signed by the testator and the witnesses.

On this occasion, Mr. McClain told Mr. Priem in the presence of Mrs. Adams what his fee would be. Mrs. Adams left the room and returned and paid the fee in cash from her own funds.

The will witness, Judge Wayland, testified that the testator knew him when he arrived at the Adams' home to witness the will; that Mrs. Adams' daughter, Mrs. Otis Daniel, in addition to the others mentioned by Mr. McClain, was also present when the will was signed. He testified that Mr. McClain read the will in the presence of all and that testator stated that the will was "the way he wanted it."

The other will witness, John D. Robinson, testified much to the same effect as did Judge Wayland, except that Mr. Robinson did not name Mrs. Daniel as being present.

Dr. H. R. Gaddy testified that he had known John Priem for six or eight years prior to his death. He testified that Mr. Priem was quite deaf, that he had a large left inguinal hernia, and that he had a skin cancer affecting the left ear. Dr. Gaddy attributed the death of Mr. Priem to arteriosclerosis and coronary heart disease.

Each of the above witnesses to whose testimony we have referred testified to the mental soundness of John Priem at the time of the execution of the will.

Mr. Green Adams, a brother-in-law of Emilie Adams, testified that when Gus Priem who was living on the farm with his father, John Priem, was accidently shot and subsequently died, that John Priem wanted to move from the farm where he lived alone to his daughter Emilie's place in Round Rock, providing they would fix him a house for himself. He testified that his brother Nils bought a house for this purpose and that several of the relatives helped move it to the Adams place near Round Rock. This was in January, 1958. In February following, Mr. John Priem moved to this house where he resided until his death. Mr. Green Adams testified that testator told him that he was going to give Emilie his half interest in the farm for taking care of him, and that Emilie took good care of him while he lived at the Adams place.

Mr. Green Adams testified at some length. He had known John Priem for forty years. His brother, Nils, was the hus-

band of Emilie Adams. His sister was the wife of Paul Priem, one of the contestants here.

We will not further detail the testimony of Green Adams. He testified to the pertinent mental competence of John Priem.

Other witnesses who testified to the mental competence of John Priem were George Mabry, a life insurance salesman who lived in Austin, Texas, and Williamson County Commissioner Sebern Barker. Mr. Barker, however, last saw Mr. John Priem in March or April 1958.

Mr. J. K. Priem, a son of John Priem, and one of the contestants, testified that he first learned of his father's will March 6, 1960, and that on March 8 he and his brothers Richard and Paul went to the Adams' house where his father was living and was shown the will by Mrs. Adams. We quote from his testimony:

"Q. Did you see Mrs. Adams on that occasion? A. Yes, sir.

"Q. You did. Tell us how you happened to meet her on that occasion. A. Well, at the time we went into my daddy's little room he had there, well she come on up right away wherever she come from, from her house or wherever she come from—I don't know where; she could come from back of the house; but anyway, she come up there and asked us to come in the kitchen. I said, 'No;' we all said, 'No,' see.

"Q. All right, sir. A. And—

"Q. What did she say? A. Then she said, 'Wait a minute. I got something to show you.'

"Q. All right, sir. A. And she brought it out, this piece of paper, you see, this instrument, and gave it to my brother Paul. He read it.

"Q. All right, sir. A. And then after that I read it and Richard read it.

"Q. All right, sir; all three of you there at the place read this instrument; is that correct? A. Yes, sir.

"Q. All right, sir. Then did you have any further conversations with Mrs. Adams after you had read this instrument; did you talk to her any more? A. Well, she just said we shouldn't talk so much, that was the doctor's orders, shouldn't talk too much.

"Q. All right, sir. A. And then finally she says, 'I can order you off the place through my attorney.' "

Contestants Paul Priem and Richard Priem testified in substance to the same matters about which their brother J. K. Priem testified.

Mrs. Paul Priem had known John Priem for more than forty years. She visited him frequently, even after he moved to the Adams place. We quote her:

"Q. Now, you have testified that you visited Mr. Priem very frequently, saw him on many occasions, even after he moved to the Adams house, if he was up and wasn't in bed. Did you always make some attempt to visit with him and converse with him? A. I did when I could, but most of the time he didn't recognize who I was.

"Q. He had difficulty recognizing you? A. Yes, he did; for the last two to three years, I would have to tell him who I was. Sometimes he would get me confused with my sister and call me Barnes; he had called me Barnes on a number of occasions, and I would tell him who I was, and the minute I would tell him, he would recognize me as Paul's wife, and another time I would meet him and he would ask me about my husband, Barnes; he would confuse me with my sister.

"Q. Let's see if we understand your testimony correctly. You have a sister who married a man by the name of Barnes? A. That's right.

"Q. And Mr. Priem would call you Barnes? A. Call me Barnes. He got me confused the last two—over two

years, he always got me confused with my sister.

"Q. Did he ask you any questions about Barnes? A. Yes, he would ask me about what Barnes was doing, and I would have to tell him that my brother-in-law had passed away, my brother-in-law was dead, that I was Paul's wife, and not my sister.

"Q. When did Barnes die? A. In September, about maybe three or four years ago.

\* \* \* \* \* \*

"Q. All right. Did you have any other difficulties, other than the fact that he failed to recognize you; did you have any other difficulties in conversing with Mr. Priem? A. Well, for the last year before he left the farm, I would have to go up and tell him who I was, and I got to where I couldn't carry on very much of a conversation with him, because he was so hard of hearing. I could just maybe repeat one word at a time to him to make him understand what I was trying to get across to him; but for the last two years, three years, we never could visit with one another like we did before, because he could not understand what I was trying to say.

"Q. You attributed it, at least partly, to the fact that he was quite deaf; is that right? A. He was quite deaf, and I got to where that I couldn't talk to him at all, practically.

"Q. Did you have any other difficulty in communicating with him. A. No, because whenever he would try to talk German back to me, I understand a little German, and when he would get confused and say a few German words along with English to me, I nearly always grasped the meaning of what he was trying to tell me, because I understood a few words, because I had been in the family long enough that I knew the expressions he would use when he wanted to express himself.

"Q. And he would express himself in German too? A. Sometimes he would mix his German in with his English when he was talking to me.

"Q. Do you actually speak German? A. No, I don't; I speak just a few words, but I can understand a little more than I can speak."

Mrs. Priem also testified that John Priem read German, but not English, and that in the last few years of his life he gave up reading. She testified that while John Priem lived on his farm, about the year 1955 or 1956, she heard John Priem comment about making a will. She testified:

"A. Well, we were visiting in a home that afternoon, that Sunday afternoon—my husband had took off from work. We went over after lunch; and we were discussing an old friend of the family that had passed away, and one of the members of the family asked—this party that we were discussing had made a will and each child had inherited so much property; so one of the members of the family asked him, he says, 'Daddy, had you ever thought about making a will?' Well, he was sitting \* \* \* back in his chair smoking his pipe, and he hit the floor with his chair. He says, 'Nein, I make no will.' He says, 'I don't claim part of my children. I claim all of my children, and all I ask is to live on this farm till I die. Then everything is to be divided equally.' He said, 'In the first place, I don't have any money to pay a lawyer. Whatever money I have got, I had to work the farm to buy food.' Now, that is exactly what my father-in-law said."

Mrs. Paul Priem expressed no opinion as to John Priem's mental capacity.

Mrs. Richard Priem, age 46, testified that she had known John Priem all of her life. She related a conversation with him after the injury to his son Gus in which Mr. Priem stated he would not move to Mrs. Emilie Adams house. She also testified that during the last two years of his life

he had difficulty in recognizing her "until I could get him to recognize my voice." She had short conversations with him but "he wasn't concentrating on what I was trying to say to him or something, or he was mumbling." She also testified that Mr. Priem always asked her about his dog which had been left at his farm, and that he spoke of his deceased son Gus as if he were living. She also related that John Priem had given her husband Richard a little red cap, "just like a child." She quoted him as saying he should never have left his farm. She testified that Mr. Priem did not keep his person clean in his latter years.

Mrs. Richard Priem expressed no opinion as to the mental soundness of John Priem.

Mrs. Marion Priem whose husband was a grandson of John Priem testified that she had known John Priem for about nine years. She described his poor physical condition, and the difficulty of communicating with him. She had seen him reading German books and papers. We quote the witness:

"A. Well, when we would go visiting Pop Priem, he didn't ever know me, but someone would come to him and explain to him in German and English, talking both half-way, and say to him that 'That is Marion's wife,' and they would say, 'Well, that is Paul's son,' and they would explain to him in that manner, and finally he would say, 'Oh, ja, ja, das ist Marion's frau,' and that is how they would get to him. Otherwise, he would have never known me if I would have walked up to him and—I would have been a ghost to him.

\* \* \* \* \* \*

"Q. Did you have any extensive conversations with him? A. Well, I sit and talked to him, and he would answer me of things that—I just said—I would agree most of the time. You couldn't talk to him, because—I couldn't talk to him; I couldn't make him understand me, because I couldn't talk German, and he understood very little English.

"Q. Did you ever ask him any questions during the course of this conversation? A. No, sir; I would just agree with him, and he would talk to me and tell me things that happened, and I would agree with him, and I would try to tell him who lived out where he used to live, and all things of that sort."

The witness saw John Priem for the last time in January 1960. Regarding this visit she testified:

"Q. What was Mr. Priem's appearance? A. Well, he was very hard of hearing. I don't believe to this day he ever knew who we were. He just laid there and looked at us, and he would always say, 'Well, all I want you to do is dig me a hole; that is all I want; just dig me a hole.'

"Q. This was in January of 1960? A. Yes, sir; when we tried to explain who we were, he never even looked up and looked at us at all."

The witness testified to the mental conition of John Priem as follows:

"Q. During your observations of him did you form any opinion as to his mental condition? A. Well, just that he couldn't hear well and he just didn't—I mean he really didn't seem—he just walked around and, well, it was all of his own—I mean he was just taking care of himself; he didn't walk around and try to have anything to do with anybody else.

"Q. Well, do you have an opinion as to the state of his mind during the year 1959?

\* \* \* \* \* \*

"Q. Was Mr. Priem of sound or unsound mind in 1959? A. I definitely say he was not of sound mind.

"Q. That he wasn't of sound mind? A. No, sir, I wouldn't think that he was. I couldn't say that he was of sound mind.

"Q. That is your opinion? A. That was my opinion, yes, sir."

John Priem's grandson, Marion Priem, testified to the inability of his grandfather to recognize him in his latter years. In May 1958 the witness testified that he asked Mr. Priem about the purchase of the 133 acre farm, but that John Priem gave his no answer. We quote from the testimony of Marion Priem:

"Q. Of course, you were conversing with him there. Did you form an opinion on that specific occasion as to whether or not he understood what you were trying to convey to him? A. Well, I could not get the point over to him, what I wanted to do, because I can't speak no German, and for him to understand, he has to be told some parts of it in German. I couldn't get the parts over to him, what I was trying to do, and from then, I didn't bother him no more about the farm, because I knew he didn't have no business-like mind, that I couldn't deal with him alone."

This witness testified that the mental condition of John Priem in 1959 was that "his mind was weak, because he could not remember who you were after a little period of time elapsed."

Reverend Wilson V. Hill, pastor of the Emanuel Lutheran Church of Pflugerville, Texas, testified for contestants that John Priem was a member of his church and that he made a pastoral call on him in 1957; also that he visited him twice in 1958 and in 1959, and a few days before his death in 1960. Reverend Hill spoke German. We quote from Reverend Hill's testimony:

"Q. How was he or how would you describe his mental condition on those dates, '57 and '58? A. I didn't find— I couldn't find anything wrong with his mental condition, except that in the hearing ability, seemed to have been such that I couldn't reach him that particular time.

\*  \*  \*  \*  \*  \*

"Q. All right, sir. When you visited him in 1959 did you note any change in his condition? A. I did. I felt that I couldn't reach him at all, communicate with him. His hearing was such that even though I put my mouth almost up to his ear, he was unable to understand me. His comprehension seemed to have been such that I felt I wasn't reaching him at all.

\*  \*  \*  \*  \*  \*

"Q. And your testimony is that in 1959 you were unable to communicate with him at all? A. Yes, sir; I had had—well, in my own opinion, he was senile, and I stayed a few minutes, and having had experience with this, and knowing that I couldn't reach him, I cut the visit short.

\*  \*  \*  \*  \*  \*

"Q. The answer to my question would be whether or not you have an opinion as to whether or not Mr. John Priem was a person of strong mind or weak mind as of August, 1959. A. I wouldn't be able to testify to that, to whether it was weak or strong, because I was convinced that he was senile, and I imagine there are measures of senility—I wouldn't know—but I know a senile person, and my own experience, that would probably increase in intensity of senility, rather than decrease, with the passing of time."

On rebuttal, proponent offered the testimony of Mrs. Frances Atkinson who is unrelated to the parties. Mrs. Atkinson operated a small store near Round Rock. She knew John Priem. He had traded with her before and during 1959. She testified Mr. Priem was of sound mind.

Also testifying to the mental competency of John Priem, on rebuttal, were Joe D. Adams, a brother of Nils Adams, Otis Daniel, the son-in-law of Mrs. Emilie Adams, Mrs. Otis Daniel and Mrs. D. I. Parker of Round Rock. Mrs. Parker was unrelated to the parties. Mrs. Otis Daniel kept her children during the day. She be-

came well acquainted with John Priem talking with him several times a week. This was in 1958 and 1959. We quote from her testimony:

"Q. Do you speak any other language but the English language? A. Well, I don't, no; but he (Mr. Priem) used to have a lot of fun; he would speak to me in German and tell me about my little girl, and then he would tell me in English, because he knew I had lived around German people and understood a few words of it, but he spoke to me mostly in English, because he knew I didn't understand enough of the German."

The proponent Mrs. Emilie Adams was called as an adverse witness by contestants. Prior to her interrogation, she was cautioned by counsel for contestants:

"Q. Now, Mrs. Adams, you were called here as an adverse witness, and I want to make an explanation to you that I am not asking you in any way to testify about any transactions which you may have had with Mr. John Priem, the deceased; and so I want you to understand my questions clearly and know that I am not calling for any answer which would involve any transaction you had with him. A. All right.

"Q. Do you understand that? A. Yes, sir."

The probated will of John Priem contained this language:

"I have made this gift to my daughter Emilie Adams for the reason that she has provided a home for me in my old age and she has cared for all of my needs in my old age and I have been a burden to her in my last years. I make this gift, not because I love her more than any other child that I have, but because she has provided a home for me as stated above."

We have stated fully the substance of all the testimony bearing on the issues of mental capacity and undue influence.

We overrule the points relating to the want and sufficiency of the evidence to sustain the finding of the jury that the testator possessed testamentary capacity when he executed his will. We specifically hold that, considering all the evidence, such finding was not so against the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust.

It would be pure surplusage for us to restate or reiterate the volume of evidence supporting this conclusion or the dearth or inadequacy of the contrary evidence. The evidence is self demonstrative of both matters.

We also sustain the action of the Trial Court in disregarding the jury finding of undue influence, and we overrule the points complaining of it. This we do after consideration of all the evidence in a light most favorable to the jury finding.

There is no question but that John Priem was in a state of health and mind that he was a fit subject for imposition and the exercise of undue influence in worldly affairs, including the making of a will. Nor is there any doubt but that an opportunity for the exercise of undue influence by Emilie Adams upon her father was created and possessed by Emilie Adams.

We go further and say that there is no doubt but that Emilie Adams by caring for her father in his last and helpless years influenced her father in leaving his property to her, rather than to all his children. The will itself is proof positive of this.

Influence is one thing. *Undue* influence is, in law, an entirely different matter.

A strikingly similar situation was before this Court in Bass v. Bass, Tex.Civ.App., 207 S.W.2d 103, 107, writ ref. N.R.E. There the principal beneficiary under the will of her father was a daughter. Contestants, alleging undue influence, were the widow, five daughters and two grandchil-

dren. It was shown that the preferred daughter had lived with her parents eight years prior to her father's death, and had worked and cared for them for no compensation except her keep. As to this the Court stated:

"Appellants allege that this was all for the purpose of procuring her father's estate. If this were appellee's motive, and if it be assumed that such motive be evil, the lawfulness of her design must still be measured by the means employed to carry it out. There can be no doubt but that appellee in bestowing care, love and affection upon her parents in their declining years influenced her father in leaving her his estate. No one would say, however, that this is undue influence sufficient to void the will.

\* \* \* \* \* \*

"Appellee is shown to have had the opportunity to exercise undue influence and she was preferred by the will. That she ever said or did anything to unduly influence or even suggest the making of any will is not shown. Appellee should not be condemned for taking care of her aged and ill parents by accusations based entirely upon surmise and suspicion."

There, as here, the will was prepared by an attorney after consulting with and receiving instructions from the testator who was 88 years of age when the will was executed and "was then practically deaf, almost, if not, totally blind, confined to his bed and suffering with a cancerous condition of his sinuses or nose, which caused hemorrhages, leaving him in a weakened and stuped condition, with severe head pains and aches."

We there held there was no evidence of undue influence.

The will here was planned, drawn and executed under circumstances exuding with unusual precaution, care, prudence, delib-

eration, openness and honesty. Most unusual also is that the making of the will was disclosed to some of the contestants about two months before the death of Mr. Priem.

We have carefully searched for some evidence of undue influence exercised by or for Emilie Adams upon her father, and that he was acting under such influence when he executed the will. We have failed to find any such evidence.

Appellants have one remaining point that the Court erred in not admitting in evidence the proffered testimony of J. K. Priem the substance of which was that the children of John Priem, including Mrs. Emilie Adams, had met and agreed that the 133 acre farm, owned one-half by them and one-half by their father, should be leased and the proceeds used to compensate Mrs. Emilie Adams for caring for Mr. Priem. The amount of such compensation was to be $50.00 per month. John Priem took no part in this conference and it is not shown he knew of the agreement.

Whether or not the lease money all belonged to John Priem since the farm was, or at least had been, his homestead is a collateral question we need not determine.

While Mr. J. K. Priem was not permitted to testify to the agreement over the objection that it violated Art. 3716, Vernon's Ann.Civ.St., regulating admission of testimony relating to transactions with decedents, the checks, 14 of them, showing monthly payments to Mrs. Emilie Adams of $50.00 each for "Father's Care" were admitted in evidence. These checks were signed "John Priem by J. K. Priem" or by "J. K. Priem and Emilie Adams."

It is our opinion that if error was committed in excluding the proffered testimony it is not reversible error under Rule 434, Texas Rules Civ. Procedure.

The substance of the excluded testimony was admitted through the medium of the

checks and deposit slips. They showed that Mrs. Adams received $50.00 a month for caring for her father from funds deposited to his account. The source of this money was shown by the testimony of Green Adams to be from leasing the farm.

The immaterial nature of the error committed, if there was error, is further demonstrated by considering its bearing upon the only two controverted issues made by the pleadings, testamentary capacity and undue influence.

If such testimony had been admitted it would have added nothing of substance to the proof or disproof of either issue.

Certainly it was impotent on the issue of mental capacity.

As to undue influence, the excluded evidence, considered objectively, was admissible as tending to prove one of the elements of undue influence, towit, that the will made an unnatural disposition of the testator's property.

However, as above shown, the substance of the transaction about which the excluded testimony was concerned, was admitted. We are also of the opinion that had this excluded testimony been admitted there still would have been absent any evidence from which the finding of undue influence could be sustained.

It is to be observed that appellants called Mrs. Emilie Adams as an adverse witness, but they did not attempt to prove by her the agreement made by the children. This they could have done without any tenable objection on behalf of the witness and without giving her the unrestricted right to testify to transactions with the decedent not relevant to the matter of the agreement. Texas Law of Evidence, McCormick and Ray, 2d Ed., Vol. 1, Sec. 332.

Finding no reversible error, the judgment of the Trial Court is affirmed.

Affirmed.