Rupert DOMINGUEZ, Individually and as
Independent Executor of the Estate of
John Duran, Sr., et al., Appellants,

v.

John G. DURAN, Jr., Individually and as
next friend of Jerry Lee Duran, a
minor, Appellees.

No. 16725.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Aug. 5, 1976.

Rehearing Denied Aug. 26, 1976.

Maurice A. Lehmann, Houston, R. A. Stallings, Rosenberg, for appellants.

Ragan, Russell & Rorschach; John L. Russell, Richard G. Rorschach, Houston; Pollan & Nicholson; Elbert V. Pollan, Rosenberg, for appellees.

EVANS, Justice.

This will contest was instituted by John G. Duran, Jr. and Jerry Lee Duran, a minor, to set aside the probate of the will of their father, John Duran, Sr. on the grounds of lack of testamentary capacity and undue influence. The proponents of the will, defendants below, were Rupert Dominguez, testator's nephew, and Fred Duran, a brother of the testator.

The case was submitted to a jury which rendered a verdict in favor of the contestants, finding both lack of testamentary capacity and undue influence. The trial court set aside the finding of undue influence and rendered judgment in favor of the contestants on the jury's finding of lack of testamentary capacity. The proponents of the will have perfected this appeal, contending that the evidence is legally and factually insufficient to support this finding of the jury.

John Duran, Sr. died in April 1974 at 72 years of age. Under the terms of his will, which was executed on May 13, 1968, the testator left his entire estate to the proponents and disinherited the contestants who were the natural children of his marriage to Matilda Duran.

Since this is a suit to set aside the probate of a will, the burden rested upon the contestants to establish by preponderance of the evidence that the testator did not have testamentary capacity at the time the will was executed. *Chambers v. Winn,* 137 Tex. 444, 154 S.W.2d 454, 456 (1941).

The contestants called one medical witness, Dr. Stanley E. Thompson, a practicing physician of some 23 years' experience, who had treated the testator on a number of occasions between October 1965 and the time of his death in 1974. Using office records and hospital records, Dr. Thompson testified that the testator had suffered cerebral thrombosis (a stroke) in September 1966; that in December 1966 the doctor had noted a personality change in the testator, who had become belligerent over the preceding few months and had difficulty getting along with his family. X-rays taken in December 1966, during the testator's hospitalization, showed that he suffered from arteriosclerosis which, the doctor explained, causes hardening of the arteries and often precedes a stroke or heart attack. According to Dr. Thompson's testimony, aging people frequently have what is termed chronic brain syndrome and are unable to think clearly because the blood supply to the brain is impaired. Some persons recover from this condition and some get worse. It was Dr. Thompson's opinion that the testator's mental condition was impaired at the time he executed his will in May 1968 and that he had suffered a gradual physical and mental deterioration from the time of his stroke to the time that he made his will. Dr. Thompson did not say just how far the testator's mental deterioration had advanced in May 1968, but stated that, in his opinion, the testator probably would not then have known the extent and nature of his properties or understood the import of business transactions in which he might then have been engaged. In response to further questioning, Dr. Thompson stated his opinion that the testator would have been able to identify and distinguish his children from other relatives or acquaintances, but that testator would not have

been able to understand business documents "to their fullest capacity."

The proponents contend that Dr. Thompson's testimony lacks probative force because his opinion is not supported by sufficient factual grounds. They argue that his opinion was admittedly based upon his "vague recollection" of the testator and from a review of his records and that the doctor was unable to give specific factual recollections as to the testator's mental capacity after the incidence of the stroke. The proponents call attention to the doctor's recorded notes in 1967 and 1968, indicating that the testator was then "doing well," and to the absence of any recorded entry during those years concerning the testator's lack of mental capacity.

It is evident that Dr. Thompson was treating the testator for physical, rather than mental disorders during the period of time following his hospitalization. The doctor's entries regarding the testator's condition primarily had reference to the physical ailments for which he was being treated. The doctor's observations of the testator after his stroke in 1966 tend to substantiate his testimony that the testator's mental condition continued to deteriorate over the years. The doctor prescribed thorazine for the testator in November 1966, October 1967 and July 1968. This drug, a tranquilizer, was often used for aging people with personality changes and for those having difficulty in remembering. Dr. Thompson testified that the drug calmed the patient down and in many older people it helped clear their minds so they could think a little better.

█ The testimony of Dr. Thompson was admissible evidence of probative force on the issue of the testator's mental incapacity at the time of the making of his will. *Chambers v. Winn,* supra. His observations made from recollection and by reference to his records constituted a sufficient factual basis for the expression of an opinion as to whether the testator was mentally capable of intelligently transacting business at the time in question. *McDaniel v. Willis,* 157 S.W.2d 672 (Tex.Civ.App.—San Antonio, 1941, writ ref'd).

The mother of contestants, Matilda (Duran) Pena, testified that she and the testator had married in 1949 and lived together until their separation in November or December 1967. The testator could not read or write the English or Spanish language, but he had been a successful business man. He had owned and operated his own farm, where they lived, and had also owned business property and a store in town. He was a good father, a good husband and treated his family "real nice." Mrs. Pena testified that her husband seemed to change after his stroke; at times he was angry and at times he cried. She saw him on about five occasions after their separation and he looked "sick, real sad eyed." He would say one thing and then in a minute or so would change it; "sometimes you could make no sense out of what he was saying or what he was doing." It was her opinion that at the time of the execution of his will, he would not have understood its import and would not have known or understood the nature and extent of his properties or the natural objects of his bounty.

The testimony of other witnesses called by the contestants was to similar effect.

Manuel Duran, a brother of the testator, said his brother became emotionally upset after his separation and that he was "mentally deteriorating."

Esther Rodriguez, a daughter of Matilda Pena by a prior marriage, had lived with her mother and the testator on their farm prior to the time she married and moved away. She subsequently stayed with the couple for a two-week visit in the fall of 1967, and said that on that occasion the testator was not the same person as she had previously known. He was then sick, depressed, crying and would forget things. On one occasion the testator had a gun and said he was going to kill himself; however, she was able to get the gun away from him. She testified that in earlier years the testator had talked about saving money for his two sons, stating that he had worked very hard for what he had, and "now that I have

my sons this will be for them if anything happens to me."

Joseph Balli, Jr., a step-son of the testator, testified that he had lived with his mother and the testator until September of 1967, when he was drafted into the Army. He testified that after the testator's stroke, he became cranky, confused and forgetful; that he was quiet, sad and to himself most of the time.

Three nieces of the testator testified that they saw the testator on Thanksgiving Day 1967 and that he was crying, confused and made no sense when he talked. Their testimony indicated that his condition did not thereafter improve.

After stating their factual observations, each of the witnesses for the contestants gave the opinion that at the time of the execution of the will, the testator was not able to intelligently know and understand business transactions, the extent and nature of his property or the natural objects of his bounty.

The proponents called a number of witnesses whose testimony indicated that the testator did have testamentary capacity at the time his will was executed. There was testimony to this effect from: Charlie Flores, who had known the testator since 1939 and who had lived in a trailer house with him after his separation; Jose F. Hernandez, who had known the testator since July 1950 and had notarized his signature on a farm lease agreement in January 1969; Alvin E. Foerster, the testator's insurance agent, who had known the testator for at least twenty years and had business discussions with him in 1967, 1968 and 1969; Mrs. L. S. Spencer, who managed the nursing home where the testator stayed in 1970; Arthur Mahlmann, an appraiser for the light and power company, who had business discussions with the testator in 1967; Reinhard Grunwald, who had sold hay to the testator in the years 1967, 1968 and 1969, and Robert Mischka, a bank officer, who had handled a bank loan for the testator in January 1969 which was subsequently paid off in 1971. There was also testimony presented from the two subscribing witnesses to the testator's will, who stated that they observed nothing unusual about the testator's mental state or condition at the time he executed his will and that he appeared to have mental capacity at that time.

The proponents argue that the testimony from these witnesses, whom they contend were respected and disinterested business acquaintances of the testator, positively demonstrates the testator's mental capability at the time the will was executed, and that the testimony of the contestants' witnesses is so against the great weight and preponderance of the credible testimony that the cause should be reversed. The proponents call attention to the fact that the testator's will was drafted by the same attorney (deceased at the time of trial) who had represented him in his divorce action and who assisted in the preparation of the property settlement agreement with the contestants' mother. The proponents also point to the fact that Matilda Pena accepted deeds of conveyance under the property settlement agreement and testified at the divorce hearing that the testator had made a complete listing of all of his property and he was fully capable of making a fair and equitable settlement with her. They urge, as a basis for the testator's rationale for excluding his two children from the benefits of his will, that the older contestant had openly sided with his mother against testator in the divorce proceeding and that the younger contestant never visited his father after the divorce.

The proponents' witnesses presented a depiction of the testator's mental condition which is in sharp contrast to that presented by the witnesses for the contestants. The testimony presented by the proponents' witnesses indicated the testator to be a reasonably astute business man, aware of his property, who could conduct normal business transactions after his hospitalization in 1966. The testimony of the contestants' witnesses, on the other hand, pictured the testator as a deeply depressed and confused person who was unable to comprehend and intelligently participate in even casual con-

versations. It was the duty of the jury to weigh all of the testimony and to determine which evidence it believed most credible on the ultimate issue before it. The jury was given appropriate instructions as to the definition of the term "testamentary capacity", and there was substantial testimony presented on the various components of the court's charge. See *Williford v. Masten*, 521 S.W.2d 878 (Tex.Civ.App.—Amarillo 1975, writ ref'd n. r. e.).

The proponents contend that the facts of this case compel reversal and remand for another trial under the holding of *Specia v. Specia*, 292 S.W.2d 818 (Tex.Civ.App.—San Antonio 1956, writ ref'd n. r. e.). In that case the jury had determined on competent testimony that the testator lacked testamentary capacity at the time he had executed his will, but the appellate court determined that the verdict was so against the overwhelming weight of the evidence as to require reversal. The opinion indicates that there was sharp dispute in the testimony as to the testator's drinking habits, his coherence and intelligibility, but that none of the contestants' witnesses had challenged his capacity to successfully handle his business affairs. In that case, and in the cases cited in the court's opinion, the evidence overwhelmingly preponderated in favor of the testator's competency at the date he executed the will.

■ Every citizen of this State has the right to dispose of his property by will as he sees fit, regardless of the ties of nature or relationship. *Stell v. Salters*, 83 S.W.2d 742 (Tex.Civ.App.—El Paso, 1935, no writ); *Green v. Dickson*, 208 S.W.2d 119, 124 (Tex. Civ.App.—Galveston, 1948, writ ref'd n. r. e.). It is not the duty of the jury or the court to say how property should be passed by will; their sole function is to decide whether the testator had testamentary capacity. *Green v. Dickson*, supra. However, the jury is entitled to consider the past relationship between the testator and his family and if the testator, without reasonable explanation, makes an unnatural disposition of his estate, the jury may consider that circumstance in weighing the evidence

of his testamentary capacity. *Craycroft v. Crawford*, 285 S.W. 275, 278 (Tex.Com.App. 1926).

■ In the case at bar the testator had no children other than the contestants, his natural sons. He had always indicated great love and affection for his children and had declared his intent to provide for their future wellbeing. At the time the testator executed the will in question, his son Jerry Lee Duran was only 6 years of age. There is no evidence indicating a rational motive for the testator's act in excluding his young son from the benefits of his estate. The jury could reasonably have determined from this circumstance and the other evidence before it that the testator suffered a disordered and confused state of mind and that he lacked testamentary capacity at the time he executed the will in question.

There is evidentiary support for the jury's verdict, and its finding of testamentary incapacity is not so against the great weight and preponderance of the evidence as to warrant a reversal of the trial court's judgment.

The proponents have brought forward certain points of error concerning the court's rulings on evidentiary matters and with respect to the conduct of the contestants' counsel during the course of trial.

■ It is first contended that the trial court erred in permitting the contestant, John Duran, Jr., to testify that he did not strike or hit his father, because such testimony violated the Dead Man's Statute, Article 3716, Tex.Rev.Civ.Stat.Ann. Three witnesses had previously been questioned by the proponents' counsel as to whether a physical altercation had occurred between the testator and the contestant. Each of these witnesses testified they had no knowledge of such an incident. Thus the testimony of the contestant in question was consistent with and not controverted by other evidence in the record. If there was error in the receipt of this testimony, it was harmless error. Rule 434, Texas Rules of Civil Procedure. *Guest v. Guest*, 235 S.W.2d 710 (Tex.Civ.App.—Fort Worth,

1950, writ ref'd n. r. e.); *Prichard v. Farmers Co-Op Soc. No. 1 of Merkel*, 183 S.W.2d 240 (Tex.Civ.App.—Eastland, 1944, no writ); *Priem v. Adams*, 352 S.W.2d 324, 333 (Tex.Civ.App.—Austin, 1961, writ ref'd n. r. e.).

The proponents also contend that the jury's verdict was improperly influenced by the cumulative effect of leading questions and improper remarks of the contestants' counsel and by the erroneous receipt of certain testimony over objection of the proponents' counsel. This court deems it unnecessary to specifically relate each of the errors of which proponents complain since it has determined that such asserted errors do not separately or collectively reflect reversible error. The trial court has considerable discretion in its rulings on these matters and this court cannot say that its rulings constitute an abuse of its discretion.

The judgment of the trial court is affirmed.