Susie SALSER et al., Appellants,

v.

Melba Faye VICK, Appellee.

No. 11150.

Court of Civil Appeals of Texas.

Austin.

Feb. 12, 1964.

Rehearing Denied March 4, 1964.

Musslewhite & Musslewhite, Lufkin, for appellants.

Lott & Willbern, Houston, for appellee.

ARCHER, Chief Justice.

This is a will contest. Appellee is the proponent of the last will and testament of A. L. Vick, deceased. Appellants are Susie Salser, John Vick, W. H. Vick, Mary Vick Richardson and husband, C. H. Richardson, Evie Vick Harris and husband, H. C. Harris, Clint Vick, Clayton Vick, Ginger Ann Vick, a Minor, by and through Doxie Vick, her Guardian and Next Friend and Doxie Vick for herself individually and as Next Friend and Guardian for Ginger Ann Vick and Lonie Mae Goetzman and husband, Wayne Goetzman, and Lawrence Clifford Roach and James Neal Roach and Littie Sue Roach are the Contestants.

A. L. Vick and Melba Faye Davenport were married on October 28, 1954, and instrument offered and admitted to probate as the last will and testament of A. L. Vick was executed on November 22, 1954. Mr. Vick died on August 5, 1957.

The will was offered for and admitted to probate by the County Court, and the contestants perfected their appeal to the District Court of Trinity County, and a trial was had to a jury and based on the jury's answer to a Special Issue, judgment was rendered admitting the instrument to probate as the last will and testament of A. L. Vick. Motion for new trial was presented and overruled, and an appeal has been perfected.

The appeal is predicated on nine points assigned as error and are that the Court erred in overruling contestants' motion for instructed verdict at the close of proponent's evidence, because there was no evidence of probative value raising the issue of the testamentary capacity of A. L. Vick, in refusing to grant judgment non obstante veredicto and to disregard the answer of the jury, that the jury finding is so against the overwhelming great weight and preponderance of the evidence so as to be manifestly unjust, wrong and contrary to law, and that there is no evidence or the evidence is insufficient to support the submission of Issue No. 1 to the jury.

Special Issue No. 1 is as follows:

"Do you find from a preponderance of the evidence that Arlen Vick had testamentary capacity on November 22, 1954, at the time he executed the purported will offered for probate within this case:

"Answer 'Yes' or 'No.'

"Answer: ————

"In connection with the foregoing Special Issue, you are instructed that TESTAMENTARY CAPACITY, as that term is used in connection with the execution of wills, and for your guidance in this case, is meant that such person at the time of the execution of the will, must have had sufficient mental ability to understand the business in which he was engaged, the effect of his act in making the will, and the nature and extent of his property, he must be able to know his next of kin and the natural objects of his bounty and their

claims upon him; he must have memory sufficient to collect in his mind the elements of the business about to be transacted and to hold them long enough to perceive at least their obvious relation to each other and be able to form a reasonable judgment as to them."

The jury answered this issue "Yes."

We believe the evidence reasonably supports the jury's answer.

The Court did not err in permitting the witness Wiley B. Thomas, the attorney who drew the will for Mr. Vick, to testify that in his opinion A. L. Vick had sufficient mental ability to have memory sufficient to collect in his mind the elements of business in which he was engaged, and to perform a reasonable judgment; that he was personally acquainted with A. L. Vick and had been for 15 to 20 years, and knew the general nature of Vick's business, that Vick executed the will in the presence of Lois Suggs, a secretary in Mr. Thomas' office and the witness, at the testator's request; that Mr. Vick's mind appeared to be normal, and for one engaged in the business of trading cattle and hauling pulp wood, Vick's mind was quick.

Mrs. Lois Suggs, called as a witness by the proponent, testified that she was employed as a secretary by Mr. Thomas and was an experienced stenographer, and had typed many wills including the will for Mr. Vick, and at the request of Mr. Vick, witnessed the will with Mr. Thomas, and identified the instrument as the will of Mr. Vick.

Henry Harvel testified that he was acquainted with Arlen Vick and bought some property from Vick in 1954 and lived in the house with Mr. and Mrs. Vick for a few weeks, and detailed the circumstances of the purchase and the obtaining of a loan and that the transaction was finally closed with Mr. and Mrs. Vick signing the papers.

There was testimony by a witness for contestants on cross-examination identifying 14 exhibits showing various loans se-

cured by A. L. Vick from 1947 to July 3, 1957 from banks, individuals and the United States Government.

Edwin McClain, called by the proponent, testified that he was employed at a bank in Groveton, Texas and had been for 16 years; that he had known Arlen Vick for 10 years and had conversations with him from time to time, mostly in the bank, concerning a loan or to make a deposit; that he had made Vick loans periodically from 1947 to 1957 and Vick was able to give description of property he wanted to borrow money on, and detailed such loans and described the securities; that all loans were paid and that the witness saw nothing unusual about Vick and, in his opinion, Vick was of sound mind.

The contestants tendered a number of witnesses all of whom testified as to actions and conduct of A. L. Vick, and were of the opinion that A. L. Vick was of unsound mind. Their testimony is lengthy but to the same tenor and effect. Many of these witnesses were related to A. L. Vick.

The evidence was in sharp conflict. The jury saw and heard the testimony of all who testified and resolved the fact issue in favor of the proponent of the will, and we believe correctly so by a preponderance of the evidence. 44 Texas Jurisprudence, p. 573, Section 32. Johnson v. Poe, Tex.Civ.App., 210 S.W.2d 264, er. ref., n. r. e.

In Green et al. v. Dickson et al., Tex.Civ. App., 208 S.W.2d 119, er. ref., n. r. e., the tests to determine testamentary wills are set forth.

The judgment of the Trial Court is affirmed.

Affirmed.

HUGHES, Justice (dissenting).

I believe that the finding of testamentary capacity of the testator, A. L. Vick, by the jury is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. I, therefore, respectfully, but futilely, dissent.

Testator's will was executed about a month after he was married to appellee. Such will left all of his property to his widow and provided that in the event she predeceased him, "then I will, give, devise and bequeath unto my beloved stepchildren," naming three children, in equal shares all of such property.

Testator had no children but he did have numerous blood relatives, including brothers and sisters and their children.

There were only two witnesses who testified that testator was mentally competent, Mr. Wiley B. Thomas, Jr., a lawyer, and Mr. Edwin McClain, a banker.

Mr. Thomas was a very casual acquaintance of testator. He had seen him about the streets and over the County for many years. He could not recall any conversations with him except on the occasion when he drew the will in suit. He talked with him then about fifteen minutes. Shortly thereafter he took his acknowledgment to a deed.

Mr. McClain, an employee of the First National Bank of Groveton, testified that he had known testator for about ten years. Most of this acquaintance was confined to business transactions at the bank. I quote from his testimony:

"Q. You made several loans?

"A. Yes sir.

"Q. When he would come in for a loan did you require some security on the loans, Mr. McClain?

"A. I sure did.

＊　＊　＊　＊　＊　＊

"Q. Based on your conversations and him describing property to you and the loans that you made him, were you able to form an opinion as to whether or not he was of sound mind or unsound mind?

"A. I think he was of sound mind.

"Q. All right, Sir?

"A. I wouldn't have loaned him the money otherwise."

Mr. McClain bought a mineral interest from testator in 1957, when Mrs. Vick was not present although she was in a car outside the bank.

Contestants offered nine witnesses who testified that testator was of unsound mind. Five of these witnesses were related to him, four were not.

I quote from the testimony of Mrs. W. H. Vick who had married testator's brother in 1945. Her home was within 250 yards of the house where testator lived.

"A. Well, he was quick tempered and we had to do kind of as he said to get along with him. He would think those Japs and stuff were after him.

"Q. Did you ever, at any time, Mrs. Vick, see him or observe him holding his head?

"A. Yes, sir, he did that very often.

"Q. Tell the jury whether or not he complained of severe headaches often?

"A. Yes sir, he did, often.

＊　＊　＊　＊　＊　＊

"Q. With reference to conversations you had with him on subjects, whether or not he would follow a conversation or if he would change the subject when you would try to talk to him?

"A. He would change the subject.

"Q. What was his demeanor with reference to repeating himself about statements he had made from time to time?

"A. He did.

"Q. Mrs. Vick, did you ever observe him having any kind or character of spells?

"A. Yes sir.

"Q. Describe those spells to the jury?

"A. Well, he would just get weak and nervous and just didn't seem to know then at all.

"Q. Would you observe any emission from his mouth at that time?

"A. Sometimes we would.

"Q. What was his condition when those spells would leave him, with reference to whether he would shake or he would be stable?

"A. He would just be nervous and shake around.

"Q. Were you ever with him when he tried to hide himself because he thought he was being bombed or anything of that sort?

"A. Yes sir.

"Q. About when was that, Mrs. Vick?

"A. Not too long after he come out of the service.

"Q. And what was his complaint at that time?

"A. That the Japs were after him.

"Q. What did he do?

"A. He went under a bush as we was carrying him home.

\*    \*    \*    \*    \*    \*

"Q. As to whether or not he made statements to you or in your presence, from the time he came out of the service up until the time of his death, that he might commit suicide, what are the facts?

"A. He made the statement that he would commit suicide time after time.

"Q. When he would go off to make any kind of deal, who did he usually have with him?

"A. He carried Arlen or Phil or W. H., here.

"Q. Arlen? You mean \* \* \* ?

"A. John. Or Bill or Nell or I would go with him, one of us.

"Q. And how did the family treat him with reference to whether he was a grown man, mature man, or a child?

"A. As a child.

\*    \*    \*    \*    \*    \*

"Q. I'll ask you, Mrs. Vick, if you observed him at any time when he tried to do violence to your husband, what are the facts?

"A. I've taken a gun away from him several times."

Reverend Cline Lewis had known testator intimately from 1953 to 1956. He testified:

"Q. I'll ask you, when you had conversations with him, what was his attitude with reference to whether or not he could follow or keep a train of thought or if he went from one subject to another often?

"A. He could not maintain a single thought for sustained periods.

"Q. I'll ask you whether or not he would repeat himself often in the conversation with reference to a certain statement made?

"A. He would repeat himself quite often, most always he would. And then he suffered considerably. I could tell he was in much physical and mental anguish.

\*    \*    \*    \*    \*    \*

"Q. I'll ask you if you were around him, Brother Lewis, when he had any character of spells and would more or less lose consciousness?

"A. Yes. Arlen did have spells that I considered to be very severe quite often.

"Q. Would you describe those to the jury?

"A. Well, I'm sure gentlemen and ladies of the jury you have observed people during your life time that suffered complete out of this world conditions with headaches and pain, and have observed them to secrete some foam in their mouth and shake, you know, of body, when this pain would be most severe. That is the best that I could describe how he acted.

"Q. Did he ever converse with you, Brother Lewis—With reference to whether or not he ever conversed with you about threatening to take his life, what are the facts?

"A. He never conversed with me with respect to taking his life as such, but he was living in constant fear that his life would either be taken by someone else or he would have to take it himself.

\* \* \* \* \* \*

"Q. The man, the way you have described him, wouldn't know how many cattle he owned or anything else, would he, Reverend?

"A. It's doubtful whether he would know how many he owned or not.

"Q. Or how they were branded or anything else, would he, Reverend, if he did own any cattle?

"A. It's doubtful.

\* \* \* \* \* \*

"Q. Do you know whether or not his brother John was with him when he was dealing with cattle and so forth?

"A. He was on occasions and then other people were with him on occasions. As a matter of fact, Arlen had the values so confused, he didn't realize true values.

"Q. Do you know whether or not when he would go to sell a cow or buy a cow if he would take his brother John with him or some member of the family?

"A. He would. He wouldn't trust his own decision."

Mr. Knode Lee was a cousin of testator and had known him all of his life. He testified regarding him:

"Q. I'll ask you, Mr. Lee, as to whether or not he was able to follow a train of thought and keep on the subject of a conversation, what are the facts?

"A. Well, he was just off and on.

"Q. I'll ask you as to whether or not he would repeat himself on some statement he had made several times during the conversation, what are the facts?

"A. He'd repeat it a lot of times, the same thing.

"Q. Did you ever see him have any character of spells, after he came out of the service?

"A. Nothing only one night I'd been with him to buy a fur and we got in a ditch and he went to sleep and I did too, and he woke me up saying that the Germans were after him.

"Q. What was his condition after he had that spell, whether or not he was shaking or otherwise?

"A. Well, he appeared to be kind of unnerved.

\* \* \* \* \* \*

"Q. Do you know whether or not his brother John was with him most of the time when he was trying to trade?

"A. John was with him a whole lot. He come around me with him. He's been around me with Arlen several times in the truck.

"Q. That was up until the time he married?

"A. Yes.

"Q. After that time who was with him most of the time?

"A. His wife there, Faye."

Mrs. Rose Ringo was not related to testator. She knew testator before he went into the service in 1941 or 1942 and afterwards. She had lived in Trinity County all of her life. She testified regarding testator:

"Q. I'll ask you whether or not he could follow a thought and keep on the subject of the conversation, what are the facts?

"A. No sir, he couldn't. He would be off.

"Q. I'll ask you whether or not he would repeat himself in a conversation on some fact, he would state it several times, what are the facts?

"A. Some things he would, yes sir.

"Q. Were you ever around him when he had any kind of spells?

"A. Yes sir.

"Q. What kind of spells did he have, Mrs. Ringo?

"A. Well, he'd just go to pieces and climb up on the doors and say that they was after him and not to let them catch him, as they was trying to kill him. He would get under the beds and couldn't get him out.

"Q. Was that many times when you were around him?

"A. Several times.

*        *        *        *        *        *

"Q. Do you know whether or not he was drawing compensation from the Government after he came out of the service?

"A. Yes, he drawed compensation after he come out of the service.

"Q. Did you ever see one of his checks?

"A. Yes sir.

"Q. Do you know how much the check was for?

"A. $101.00.

"Q. Do you know while he was in the service he was in the hospital some?

"A. Yes sir. He was in the hospital for treatment of his mind.

*        *        *        *        *        *

"Q. Mrs. Ringo, was his mind such that if he owned any cattle or property or anything that he would know what he owned or the value of it?

"A. I wasn't with him then. What I tell you and that was what I've just said and that's all I know. I never was around him with his cattle, but I know of his working. Whatever thing he did there was always some of the family with him.

"Q. Let's say if he owned any cattle, do you think from the way you have described him that his mind was such that he would know what the value of a cow was or how much to sell it for?

"A. I don't think so. I really don't think so.

"Q. He probably wouldn't be able to describe—Say, if he wanted to make a loan, he wouldn't be able

to describe or tell how many cattle he owned and a description of them, would he?

"A. I don't think he could keep it in his mind long enough.

* * * * * *

"Q. Mrs. Ringo, you say that some of the family stayed with him most of the time?

"A. Yes sir. Wherever he was at work there was some of his family around. I never knowed him doing anything and being alone. There was always some of them with him.

"Q. Did they treat him as a child, would you say?

"A. Yes sir."

Mrs. Melva Weeks was a cousin of testator and had known him all of his life. Regarding him, she testified:

"Q. Mrs. Weeks with reference to whether or not he was able, after he came out of the service, to carry on a conversation, stay on one subject while he was conversing with you, what are the facts?

"A. Well, he talked at random. He would say things over and over.

* * * * * *

"Q. With reference to whether or not he would try to transact business by himself or if he had someone with him, some member of the family, after he came out of the service, what are the facts?

"A. I never knew of him trying to transact any business by himself. Usually Uncle John was with him.

"Q. Did he keep his Uncle John with him most of the time when he would be trying to transact business?

"A. Yes sir, he was with him at all times.

"Q. Did they stay together a great deal?

"A. Yes sir, they were together all the time.

"Q. That was up until the time he began living with Mrs. Melba Faye Vick, is that right?

"A. That's right. Usually when you saw one, you saw the other.

* * * * * *

"Q. Did you ever see him have a spell when he would kind of pass out?

"A. Well, he would just act like he was hurting so bad until he would almost pass out.

"Q. Were you ever around him when he would get under the bed and that sort of thing?

"A. Well, he would just kind of roll around on the floor and under the bed.

"Q. Were you ever around him when he imagined he was being bombed?

"A. Yes, he talked quite a bit, he acted like he was still in service. Sometimes he acted like he didn't know exactly where he was.

* * * * * *

"Q. Do you know what kind of work Arlen was doing?

"A. So far as I know he wasn't working. I don't believe he held a job after he came out of service. I'm not sure about his work.

"Q. All right. From the description that you gave this jury, do you think he would have been able to know the value, say of cattle or pulpwood?

"A. I don't believe he would. I believe he would ask someone's opinion."

Mr. Wayne Gaston was not related to testator. He lived on land adjoining testa-

tor's property. He knew testator before and after he was in the service. Regarding him, he testified:

"Q. In conversations you had with him, Mr. Gaston, tell the jury whether or not he was able to follow through a conversation, one subject, without changing the subject or not?

"A. No. The biggest part of the time he would start a conversation and then he would just switch it around. Maybe he wouldn't finish one until he'd start something else.

"Q. In conversing with him, tell the jury whether or not he would repeat himself in a conversation on some fact and state it several times?

"A. Oh, yeah, he'd repeat hisself.

  *     *     *     *     *     *

"Q. Do you remember the time that his house burned?

"A. Yeah.

  *     *     *     *     *     *

"Q. What was the condition of the house at that time with reference to whether it was all aflame or just some of it?

"A. Well, the top of it—The biggest part of the top of it was aflame. It taken it some bit to burn down after I got there.

"Q. Was it burning on the inside?

"A. Yeah.

"Q. Tell the jury whether or not Arlen Vick wanted to go back in that house and they had to hold him to keep him from going back in?

"A. Yeah, he wanted to go back in and they had to hold him to keep him from it.

  *     *     *     *     *     *

"Q. Well, I'll ask it this way: I'll ask you whether or not he said there, 'Dear John'?

"A. Dear John, yeah.

"Q. I've brought your saddle home?

"A. I've brought your saddle home.

"Q. Had you heard him say that before?

"A. Oh, yeah, I heard him say that might near every time I was with him.

"Q. Do you know whether or not he had imagined that he was being bombed or something of that sort?

"A. Well, I've heard him say that, but I never did see him. I've heard him say he was afraid he was going to be bombed.

"Q. I'll ask you if he imagined that some varment was going to attack him?

"A. He was all time hearing varments. I know he said they scared him out of the woods right around his house there.

  *     *     *     *     *     *

"Q. You don't feel like that Arlen would be able to trade and know the value of his property?

"A. No, not the way he was going since he got out of service. I'll put it that way.

"Q. That's from 1945 up until the time of his death?

"A. Time of his death.

"Q. Well, let me ask you this, Mr. Gaston: If he had come to you and wanted to borrow money from you, would you have loaned it to him after the way you described his mind?

"A. Well, that question I couldn't—

"Q. You would have been leery of it, wouldn't you?

"A. I shore would."

Mr. Melvin Lee was a cousin of testator and had known him before and after he was in the service. Regarding him, he testified:

"Q. I'll ask you, when you would have a conversation with him, if he would change the subject from time to time during the conversation?

"A. Yes sir, he sure would.

"Q. I'll ask you whether or not he would state the same facts several times?

"A. Some. Yes sir, he sure would.
  *　*　*　*　*　*

"Q. Were you ever around him when he would have any kind of a spell?

"A. He's been around me when he would dodge and he said something like a bomb was coming, something like that. Shells. Yes sir, he shore have.

"Q. Well, were there actually any bombs around?

"A. No sir. I didn't hear anything myself.
  *　*　*　*　*　*

"Q. Did you ever hear him saying anything about Dear John, I've brought your saddle home? Did you ever hear him make any such statement as that?

"A. I've heard him saying that, but I don't know what it meant.

"Q. Would he be talking to anybody?

"A. Oh, yeah, he'd be talking, you know, just as usual.

"Q. He would just say that in the middle of a conversation?

"A. Yes sir. Just start off, yes sir. He sure would.
  *　*　*　*　*　*

"Q. Did he ever buy a cow from you?

"A. Yes sir.

"Q. Who was with him at that time?

"A. His brother John.

"Q. Do you know whether or not John stayed with him most of the time?

"A. Most of the time, yes. He was at my house lots with him. He sure was. He was with him when I sold him the cow. He sure was.

"Q. Did the family treat him more like a child?

"A. They treated him mighty nice. They sure did.

"Q. Some of them tried to stay with him all the time?

"A. Well, they did. Most of them was around all the time."

Mrs. Nell Steele was a niece of testator. She lived with him and his mother before he went into the service and after he was discharged. Regarding him she testified:

"Q. Do you know whether or not your Uncle Arlen was in the hospital while he was in the service?

"A. Yes sir. He was in two of them.

"Q. Where was he in the hospital?

"A. He was in two of them. One in England. And he stayed there around eight months.
  *　*　*　*　*　*

"Q. Then after he got back to the states, was he confined to a hospital then?

"A. Yes sir. That was in San Antonio, before he was discharged.

"Q. Did he have any wounds or was he in the hospital for—?

"A. He was in the hospital for a mental break down, it was a nervous collapse.

\* \* \* \* \* \*

"Q. Now, from that time, Mrs. Steele, were you around your Uncle Arlen a good bit of the time?

"A. Yes sir.

"Q. Did you continue to be around him up until the time of his death?

"A. Yes sir. We all lived in Apple Springs. I married and lived there in hollering distance of them. And during the illness of my grandmother I was in the home most of the time.

\* \* \* \* \* \*

"Q. After your Uncle Arlen came back from service did you ever hear him complain of having severe headaches?

"A. Yes sir, he complained of severe headaches. And he would catch and hold in the back of his head at times. And at times he would break down and cry with them, they would be so severe in the back of his head. And we have even had to take him to the hospital to get shots more or less to ease his head and keep him from drawing. His hands and all would draw up and he would just be drawing all over, even his mouth and face would draw. We could take and get him a shot and it would quiet him down. Maybe he would sleep for a day or a day and a half after that and he would be quieted down.

"Q. Were you ever around him when he would hold his head; did you ever hear him say anything?

"A. He would just cry and take on and we would try to get him to go to the doctor and he would say no.

\* \* \* \* \* \*

"Q. What kind of spells did he have?

"A. You know, when he would have them you would never know when they was coming on him and all. Like for instance, we were trying to carry him home once. We were living right there close to him. We were trying to carry him home and he wouldn't get in the truck with us. He thought evidently it was something different from what he had been in and we was going to walk him home. We had him going from my house down to my grandmother's.

\* \* \* \* \* \*

"A. And he would get mad at the rest of the family and Mrs. Fonzie and myself and Mrs. Weeks was some of the bunch that he would never get mad at and we were trying to get him home. He jumped loose from us and run under a bush, hollering the enemy was after him. He could hear the bombs And then you would have to work with him to try to get him to go on and make him realize that it wasn't anything.

"Q. Were you ever around him when he would have a spell and he would get under the bed, thinking he was being bombed?

"A. Yes sir. He would go to bed at night and he would wake up hollering and cutting up and you would go hunt him and he would be under the bed or something, and he would say the bombs are coming, he could hear them whistling. It was just different things like that. If there was the

least little bit thing different in his bed, well, he would think somebody hid something in his bed that was going to hurt him or something. You would just have to work with him to even get him back in bed. Maybe you would even have to lay on the bed with him before he would ever lay down on it.

"Q. Do you know whether or not he had any of those kind of spells before he went into the service?

"A. No sir, he didn't.

    \*    \*    \*    \*    \*    \*

"Q. As to whether or not the family looked after him like he was a small child, what are the facts?

"A. We did look after him just like he was. And anything that was to be done at all, well, we looked after him and went with him. There was some of us with him to help him do anything. In fact, he wouldn't do anything unless somebody else was with him, regardless of what job he had to do or anything about it.

    \*    \*    \*    \*    \*    \*

"A. Well, he worked with him and my Uncle John. He never got out of sight of the family, unless some of us was with him.

"Q. If he bought a cow or sold a cow, he would take your Uncle John?

"A. To my *acknowledge*, I never knowed him buying anything until he got the opinion or carried Uncle John and let him to the judgment of buying the cow and all, or the swapping or anything that he bought or sold. If it was furniture or anything like that, well, I was always the one that had to go with him to make the deal and pick it out and so forth and on.

"Q. He didn't risk his own judgment about any business transaction?

"A. No sir, he sure didn't. Even in fixing up the home just before his mother died, well, I had to do all of the picking and arrangement of having that done.

    \*    \*    \*    \*    \*    \*

"Q. I'll ask you if he ever threatened to take his own life?

"A. Yes sir, he did.

    \*    \*    \*    \*    \*    \*

"Q. Well, may I ask you to explain what you mean by him threatening the life of his brother and sister?

"A. Well, we always kept the guns away from him. He took that one and was going to shoot my father and aunt and I took it away from him. And we always kept the guns apart.

    \*    \*    \*    \*    \*    \*

"Q. Now, he died about August 5th of '57?

"A. Yes sir.

"Q. Do you know whether or not he took some poison at that time?

"A. I don't know that he took it, I didn't see him when he took it. But I know that's what the doctor said that killed him.

"Q. Did they bring a container of dog spray?

"A. Yes sir, they said it was dog spray and brought it to the doctors to examine to see if they could find an *antibiotic* to it. And it was from overseas or somewhere and they didn't have the *antibiotic* here that would have done him any good. In other words, his lungs was done

cooked by it at that time. It wouldn't have done him any good anyway by the time they got him to the hospital.

\*  \*  \*  \*  \*  \*

"Q. You don't know actually whether he was, himself, trading in cattle, when he was away from the house buying and selling cattle?

"A. He never bought cattle by hisself. He always carried my Uncle John to get his approval or what he thought about it. As far as his cows, my Uncle John was with him. And as far as the home and all supplies, either fixing up or buying anything around the house, that was my part."

Mr. Delton Holcomb was unrelated to testator. He lived in the Crecy community, about one half mile from the Vick place, from 1945 to 1960. He knew the testator well.

"Q. Did you ever see him have any other character of spell of any kind?

"A. Yes sir, I've seen him just fall of his horse and just roll.

"Q. What would be his condition at that time?

"A. He would say he was hurting and he would go to talking and you couldn't understand him because he was groaning so.

"Q. Were you ever around him when he would imagine that he was being bombed?

"A. Yes sir.

"Q. And what would happen on those occasions?

"A. He would try to get under something and hide. If he was in the woods he would get off his horse and get down under brush, ducking from it.

"Q. Did you ever hear him say anything similar to this: Dear John, I've brought your saddle home?

"A. Yes sir, I have. I've heard him when he would be riding, come up on me in the woods, and he would be singing, Dear John, I've brought your saddle home. It was just over and over, the same thing.

"Q. Did you ever hear him talking to his horse, as if it was a person?

"A. Yes sir. And his dog also.

"Q. Was that many or few times?

"A. Many times.

"Q. Were you over at his house the night his house burned?

"A. Yes sir.

"Q. Was Melba Faye there that night?

"A. No sir.

"Q. Do you know whether or not he tried to get back in the house while it was still on fire?

"A. Yes sir, he did.

"Q. Was it burning on the inside when he tried to get back in it?

"A. Yes sir, a complete flame all over.

"Q. Why didn't he go back in the house?

"A. I held him back.

"Q. Did he say anything about Dear John, I've brought your saddle home?

"A. Yes sir. He was constantly talking and we had to hold him down. I mean hold him to keep him from getting back in the house. We almost had to knock him out to keep him from getting back. He said he wanted to burn up, every-

thing was burning up and he wanted to burn up with it.

\* \* \* \* \* \*

"Q. In talking to him and carrying on conversations with him, tell the jury whether or not he would change the subject while you were talking to him, wouldn't stay on the subject?

"A. Well, you couldn't carry on a conversation with him because like if you was talking about cattle or something, he'd change the subject and go to talking about something else, he wouldn't continue on the same subject.

"Q. Tell the jury whether or not he would state over and over certain facts while he was talking to you?

"A. Yes sir, he would. I mean, if you was talking about something he would go to talking about something else, and by the time you started talking about that he would be right back on the same thing that you started on.

"Q. Were you around him enough to know whether or not his family treated him as a child or a grown person?

"A. It seem to me that they treated him as a child, for some of them was with him all of the time.

\* \* \* \* \* \*

"Q. Do you know Mr. John Vick?

"A. Yes sir.

"Q. Was he with him most of the time?

"A. Yes sir.

"Q. When he was out, away from home?

"A. Yes sir.

\* \* \* \* \* \*

"Q. Do you think in '57 he would have been able to make an appraisal as far as the value of any property he had?

"A. No sir.

"Q. Do you think that he would have been able to make an appraisal, if he wanted to sell, say, some land or mineral interest or anything like that, that he would have been able to make an appraisal and know the value of it?

"A. No sir, not unless he had some help."

I would reverse and remand this case.